## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

|  |  |
|---|---|
| **ESTATE OF IAN THOMAS STRICKLER,** )<br>**by STEPHANIE FIANDACA-STRICKLER,** )<br>**Administrator of Estate** ) | |

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

7/04/2025
LAURA A. AUSTIN, CLERK
BY: _/s/ Amy Fansler_
DEPUTY CLERK

ESTATE OF IAN THOMAS STRICKLER,                    )
by STEPHANIE FIANDACA-STRICKLER,                   )
Administrator of Estate                            )
                                                   )
      Plaintiff,                                  )
                                                   )
v.                                                 )
                                                   )
FREDERICK COUNTY                                   )
SERVE:  Austin Cano, Acting County Attorney        )
107 N. Kent Street                                 )    Case No:  5:25cv00063
Winchester, VA 22601                               )
                                                   )
STEVEN MAJCHRZAK, named in                         )
his individual and official capacities             )
SERVE:  Steven Majchrzak                           )
3 Reed St.                                         )
Middleburg, VA 20117                               )
                                                   )
KYLE RITTER, named in                              )
his individual and official capacities             )
SERVE:  Kyle Ritter                                )
106 Timberlake Terrace, Unit 1                     )
Stephens City, VA 22655                            )
                                                   )
      Defendants.                                 )

## **COMPLAINT**

     Plaintiff Estate of Ian Thomas Strickler, by Stephanie Fiandaca-Strickler as

Administrator of the Estate, by and through counsel, brings this civil action against Defendants

Frederick County, Stephen Majchrzak and Kyle Ritter for unlawful deprivation of his rights and

privileges secured by the U.S. Constitution, federal, and state law under 42 U.S.C. §1983. In

support of its allegations, Plaintiff states the following:

1. Plaintiff Estate of Ian Thomas Strickler brings this complaint pursuant to 42 U.S.C. §1983, alleging violation of his Fourteenth Amendment fundamental right to life and denying Mr. Strickler's constitutional right to be free of arbitrary governmental action under the Fourteenth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

2. This federal action arises under the Fourteenth Amendment of the United States Constitution through the cause of action created by the Civil Rights Act of 1871 (42 U.S.C. §1983, "Section 1983"), as modified by the Civil Rights Attorney's Fee Award of 1976 (42 U.S.C.A. §1988(b)). Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1343(a)(4).

3. This Court has personal jurisdiction over all the Defendants as they reside and/or work within the Western District of Virginia.

4. Venue is appropriate in the Western District of Virginia and this matter is properly in the Harrisonburg Division, pursuant to 28 U.S.C. Section 1391(b), because a substantial part of the events or omissions giving rise to the Section 1983 claim and all related state-based claims occurred within Frederick County, which is a part of the Harrisonburg Division of the Western District of Virginia.

## PARTIES

5. Plaintiff Estate of Ian Strickler was a natural person and a citizen of the United States. Mr. Strickler was a "person" within the meaning of 42. U.S.C. §1983. At the time of his death, Mr. Strickler was an employee of Frederick County's Fire and Rescue Department.

6. Defendant Frederick County is a locality created under the laws of the Commonwealth of Virginia. Frederick County is a "person" within the meaning of 42 U.S.C. §1983.

7. Defendant Steven Majchrzak is the Fire Chief of Frederick County's Fire and Rescue System, and he is the final policymaker with regard to the management, supervision, and control of the operations, activities, affairs, property, policies, and employment conditions of Frederick County Fire and Rescue System. Defendant Majchrzak is a "person" within the meaning of 42 U.S.C. §1983. Steven Majchrzak is named in both his individual and official capacities. Defendant Majchrzak is liable for the violations of law and relief claimed herein.

8. Defendant Kyle Ritter is a firefighter employed by FCFR and was the lead instructor of FCFR's fire recruit school at the time of Ian Strickler's death. Kyle Ritter is a "person" within the meaning of 42 U.S.C. § 1983. Kyle Ritter is named in both his individual and official capacities. Kyle Ritter is liable for the violations of law and relief claimed herein.

## FACTS COMMON TO ALL PARTIES

### *Frederick County Fire and Rescue Department*

9. Frederick County Fire and Rescue ("FCFR" or "Fire Department") is a department within Frederick County primarily responsible for providing fire, rescue, and emergency medical services to its constituents throughout the county.

10. FCFR comprises career and volunteer firefighters. Both groups of firefighters are headed by a System Chief, otherwise known as the Fire Chief.

11. Per County ordinance, the Fire Chief supervises and manages the duties and responsibilities of the Fire Department's career personnel. He has complete discretion in transferring, displacing, or onboarding career personnel in various positions.

12. Furthermore, the Fire Chief is tasked with formulating, administering, and enforcing department-wide operational and administrative rules, regulations, and policies governing the

Fire Department in consultation with advisory bodies, which are managed and administered by the Fire Chief.

13. If the Fire Chief and his advisory bodies cannot agree on a system-wide rule, regulation, or policy, an Executive Committee is convened to reconcile opposing viewpoints. If the Executive Committee is unsuccessful in doing so, the County Administrator is called upon to render a final determination upon the disagreed-upon rule, regulation, or policy. The County Administrator makes no other final determination except for those that the Executive Committee cannot reconcile between the Fire Chief and his advisory bodies.

14. One of the prerogatives of the Fire Chief is the ability to implement a firefighting recruit school, including choosing instructors, executing contracts with third parties for equipment or physical training services, and soliciting state funding for various fire training programs.

15. In the early 2000s, FCFR's then-Fire Chief chose to implement a fire recruit school. Lacking any internal policies, FCFR chose to follow and enforce state-wide firefighting training programs and standards promulgated by the Virginia Department of Fire Programs ("VDFP"). The VDFP, in turn, promulgates certifications, courses, rules, and procedures published by the National Fire Protection Association (NFPA).

*Kyle Ritter and FCFR's Recruit School*

16. Kyle Ritter is a former United States Marine Corps servicemember and current FCFR firefighter who previously held the position of Lead Instructor for FCFR's Training Division, assigned to oversee training for FCFR's fire recruit school. By 2023, Kyle Ritter had received his Instructor 1, Instructor 2, and Instructor 3 certifications through the VDFP.

17. The VDFP instructor certifications are tailored after the National Fire Protection Association ("NFPA") 1041, "Fire & Emergency Services Instructor." These courses are designed to equip aspiring instructors with the skills necessary to effectively manage firefighting training academies. The instructor certifications are outlined as follows:

   a. Instructor 1 certification is designed to equip instructors with the necessary skill set to manage basic resources, records, and reports essential to the instructional process.

   b. Instructor 2 certification is designed for the proper management of instructional resources, staff, facilities, records, and reports.

   c. Instructor 3 certification is designed to facilitate the administration of fire department policies and procedures for managing instructional resources, staff, facilities, records, and reports.

18. By completing these courses, Kyle Ritter has been taught and made aware of the requirements for safely and effectively performing a variety of duties as an instructor, including how to organize training materials for recruits, lead training programs, and, most importantly, maintain safe training practices for new fire recruits by enlisting certified physical trainers for physical training regimens.

19. As a longtime firefighter, Kyle Ritter also held the following certifications: Firefighter I, Firefighter II, HAZMAT, and EMT-B. In 2023, Kyle Ritter was the chairman of FCFR's wellness committee.

20. Notably, none of these certifications properly equipped Kyle Ritter to either manage, oversee, or implement physical training regimens for FCFR's fire recruits. NFPA 1583,

"Health-Related Fitness Programs for Fire Department Members," outlines the required certifications physical training instructors need to be qualified for the role.

21. Specifically, NFPA 1583 called for physical training instructors to have a background in functional anatomy, exercise physiology, exercise testing and prescription, exercise supervision, and leadership. These skillsets are to be coupled with a minimal level of physical training certification from either of the various professional organizations providing training, including but not limited to: American College of Sports Medicine, American Council on Exercise, International Association of Fire Fighters, International Association of Fire Chiefs, American Council on Exercise, National Strength and Conditioning Association, and the National Academy of Sports Medicine.

22. Kyle Ritter's instructor certifications qualified him to provide classroom instructions, establish curricula, and manage the administration of a fire department's recruit school. It did not qualify him to provide, lead, or dictate the recruits' physical training regimen.

23. Despite this, at some point prior to 2016, then-Fire Chief Dennis Linaburg and Deputy Chief Keith Jenkins began formulating a plan to transform FCFR's recruit school into a "paramilitary" school, designed to transform firefighters into soldiers when deployed to the field.

24. Then-Fire Chief Dennis Linaburg and Deputy Chief Keith Jenkins believed that FCFR's current fire recruit school was inadequately managed, providing recruits with very light physical training, which stood in contrast to the physically demanding role of a firefighter. This was assumed even though many of FCFR's fire recruits were already pre-certified, having completed their physical training requirements before entering recruit school.

25. To facilitate the transformation of FCFR's recruit school into a "paramilitary" school, Deputy Kieth Jenkins sought out a current firefighter with prior military experience. He found one in Lieutenant Kyle Ritter.

26. Kyle Ritter became a firefighter in 2006. Before that, he was a servicemember of the United States Marine Corps. Kyle Ritter was selected to become a training instructor solely because of his prior military service and FCFR's goal of transforming its recruit school into a "paramilitary" school. Then-Fire Chief Linaburg and Deputy Chief Keith Jenkins did not care that Kyle Ritter lacked the proper qualifications to lead a physical training regimen. They saw in Kyle Ritter a soldier who could utilize his experience in the Marine Corps to mold recruits into effective soldiers. As he would subsequently disclose to Ian Strickler's widow shortly after Ian Strickler's death, Kyle Ritter was aware of his lack of qualifications but chose to accept the role anyway.

*Kyle Ritter as FCFR Training Instructor*

27. From 2016 to 2018, Kyle Ritter assumed a supporting role as one of the instructors of FCFR's recruit school.

28. 2018 marked Kyle Ritter's first year as FCFR's Lead Instructor of its recruit school. At this time, FCFR was running its 8th recruit class. The first day of recruit school was marked by a traditional orientation of the training academy, which included curriculum expectations, proposed training schedules, and a meet-and-greet with FCFR personnel.

29. Day Two and onward of recruit school marked what was collectively called by its recruits "Kyle's House of Horrors." Each day of the seven-month-long recruit school journey dedicated to physical training ("PT"), was marked by intensive physical exercises that often

resulted in injuries for the recruits. Recruits were forced to run multiple suicide runs across fields, climb up and down hills with sandbags, repeat the process with wet sandbags for added weight, run mile-long treks to the nearest stationhouse, and flip firetruck tires. These workouts were compounded by various other exercises, often with little to no break between sets, resulting in many recruits falling over, collapsing, and vomiting onto themselves.

30. Water breaks were brief, meals were short, and PT days were long, with training lasting from sunrise to sunset. The recruits' only respite was when they were doing classroom instructions. However, any disruption or failure to follow protocol or provide proper greetings to superiors was met with "punishments," which resulted in Kyle Ritter berating the recruits and forcing them to engage in physical activities similar to what they had already endured during their PT days.

31. It became clear that Kyle Ritter and his cadre of instructors were enthusiastically hazing the recruits. At times when the recruits were doing abdominal exercises, Kyle Ritter or one of his fellow instructors would approach recruits and hose their faces with water. Similarly, recruits were often sprayed with a firehose when performing jumping jacks or other similar workouts. Several instructors would bring bullhorns and shout at the recruits, calling them losers, weak, and pathetic. All the while, Kyle Ritter would constantly berate the recruits, call them derogatory names, and threaten that if they failed to keep up with their PT, they would be forced out of recruit school.

32. Kyle Ritter made it clear that he would not tolerate anyone slowing down the class, often resorting to physically pulling and pushing recruits along when their own bodies gave up on them. Despite exerting their bodies to the point of collapse, recruits were in constant fear of

falling behind or failing to meet expectations, out of concern that Kyle Ritter would fail them and prevent them from becoming firefighters.

33. Notably, while NFPA 1583 encourages strenuous physical workouts (within proper safety parameters), it specifically discourages punitive measures.

34. In any case, Kyle Ritter's behavior and treatment of the recruits worsened to the point that a whole recruit class (believed to be Recruit Class 9) collectively went to FCFR's Human Resources to report him.

35. One notable instance of Kyle Ritter's behavior surfaced with a female recruit of Recruit Class 10, wherein she received so many injuries relating to PT that FCFR's senior leadership warned Kyle Ritter to stop documenting injuries or otherwise lose his job as a trainer.

36. Recruit Class 10 logged over twenty-three (23) injuries relating to PT.

37. In total, between Recruit Class 9 and 10, nearly thirty (30) injuries were logged relating to PT – almost one injury per recruit.

38. During this time, then-Fire Chief Dennis Linaburg retired, and Steven Majchrzak took over in his place. As the individual with the ultimate authority to displace Kyle Ritter from his post, Chief Majchrzak took another course of action and commended Kyle Ritter's conduct.

39. Oftentimes, before the start of each recruit class's PT, Chief Majchrzak would meet with the recruits and express his admiration and approval of Kyle Ritter's training methods. He would often state that not only has he seen Kyle Ritter's training style, but he also condones it and supports Kyle Ritter's decisions pertaining to PT.

40. None of Fire Chief Majchrzak's advisory bodies issued any complaints regarding his decision to retain Kyle Ritter as lead instructor of the recruit school. The issue was never elevated to FCFR's Executive Committee.

*Winchester City's Rescission of its Then-Proposed Joint-Training Program*

41. At some point after Kyle Ritter took over as FCFR's Lead Instructor of its recruit school, the neighboring Winchester City Fire and Rescue Department approached FCFR to discuss the possibility of conducting a joint firefighting training program. Winchester Fire and Rescue sent its Battalion Chief of Training, Adam Still, to observe FCFR's training program, which led to him observing first-hand Kyle Ritter's hazing of the recruits.

42. Originally scheduled to observe a full day of PT, Adam Still witnessed Kyle Ritter's hazing and mistreatment of the recruits. With disbelief, Mr. Still turned to FCFR firefighter Lt. Kevin Whitacre and asked if Kyle Ritter was behaving this way because of his presence. When told that this was Kyle Ritter's normal behavior and treatment of his recruits, Mr. Still responded that he had seen enough and left before schedule.

43. Ultimately, Winchester City Fire and Rescue Department chose not to conduct a joint training program with FCFR, choosing instead to mount its own training program, rather than work alongside FCFR and Kyle Ritter.

44. Around this time, Lt. Whitacre approached Kyle Ritter and warned him of the potential danger posed by his training methods to the lives of recruits, to no avail. Lt. Whitacre escalated the concern to both Fire Chief Majchrzak and Deputy Chief Jenkins; however, neither took his concerns seriously, but attempted to assure him that no one would be seriously hurt. In that meeting, Deputy Chief Keith Jenkins remarked, "I stand by my marine" in reference to Kyle Ritter and his training methods.

45. Still, these events did prompt FCFR to take measures to minimize injuries and promote itself as a safe training academy for firefighting recruits.

*Hiring OneLife Fitness to Reduce Recruiting Injuries*

46. In late 2021, as a result of the massive number of injuries logged by fire recruits, Fire Chief

    Majchrzak decided to contract fitness club OneLife Fitness to facilitate Kyle Ritter's training

    of the recruits. Focusing on cardiovascular strength through bilateral and unilateral exercises,

    Onelife Fitness Instructor Rebecca Toler was hired by FCFR to promote healthier firefighters

    through various strength-training and mobility exercises while minimizing injuries.

47. The goal was to create healthier firefighters through tailored physical training exercises

    designed to enhance response times and physical endurance for various emergency situations.

48. Despite this overarching objective, Fire Chief Majchrzak did not wish to relinquish FCFR's

    "paramilitary" recruit school, so he retained Kyle Ritter as Lead Instructor for select days of

    PT. In practice, this meant that Kyle Ritter retained total discretion to train the recruits as he

    saw fit for the early days of recruit school before responsibility was then transferred to Ms.

    Toler. Kyle Ritter also retained jurisdiction in delivering "punishments" for classroom

    disruptions or perceived delinquencies in physical training sessions with Ms. Toler.

49. Despite hiring Ms. Toler, FCFR willfully chose to ignore NFPA 1583 by continuing to

    provide Kyle Ritter unfettered discretion to haze recruits on select training days and when

    delivering "punishments."

50. Recruits would come to recognize the first days of PT as Kyle Ritter's "hell days" for the

    same abusive and demeaning hazing the recruits of prior years underwent.

*Near-Death Incident of Nicholas Blake*

51. Shortly thereafter, in 2022, in its first year working with OneLife Fitness, FCFR experienced

    one of its closest near-death incidents involving its recruit school. A training incident

involving Kyle Ritter and fire recruit Nicholas Blake led to the latter's transportation to the hospital after suffering a cardiac event.

52. Nicholas Blake ("Nick") was a Fire Recruit of Recruit Class 11, which began its training on March 03, 2022. Earlier that morning, Nick went to Ms. Toler to get his "Inbody" measured and perform a couple of mobility exercises. Shortly thereafter, Nick, along with the rest of Recruit Class 11, was transported out to FCFR's Public Safety Building to undergo Kyle Ritter's "hell day."

53. Kyle Ritter began the training with a run around the building during which he screamed at the recruits, calling them derogatory and demeaning names, such as "pussies" and "faggots." In addition, he called several recruits "worthless," and told them that he was going to work them to death.

54. Several laps into the run, Nick Blake started to fall behind noticeably, and Kyle Ritter began screaming at him and calling him derogatory and demeaning names, as noted above. Kyle Ritter exclaimed to Nick Blake that he was worthless, a quitter, and "a pussy." Nick Blake told Kyle Ritter that he felt that something was wrong, and that he was going to drop. Kyle Ritter told him that he did not care, and Nick Blake had better continue with the course. Kyle Ritter continued to call Nick Blake derogatory and demeaning names. Throughout the rest of the run, it became a pattern for Nick Blake to continue struggling to run, fall, get yelled at by Kyle Ritter to continue running, and repeatedly fall again.

55. Additional rigorous physical training was given to the recruits, which caused Nick Blake to collapse at various points, followed by Kyle Ritter screaming at him to continue forward. At one point, Nick fell and was grabbed and hoisted by his shirt collar by Kyle Ritter as the latter continued yelling at Nick Blake, telling him to "get up before I fuck you up."  Nick Blake

mustered his remaining strength and got up one more time; however, he fell again shortly thereafter. Once on the ground, he was on all fours. He was having difficulty with his vision and hearing, and his heart was beating so hard he could feel it in his ears. Additionally, Nick Blake struggled to breathe, and he began experiencing terrible chest pains. Shortly thereafter, Nick collapsed onto the ground, unable to move.

56. Eventually, unable to get off the ground with his own strength, Nick Blake was assisted by Lt. Kevin Whitacre and moved over to a picnic table to be hooked up to a heart monitor. One of the training instructors administered Nick's heart readings and saw that his heart rate was so dangerously high that he exclaimed, "Oh my God."

57. Throughout all of this, Kyle Ritter continued to berate Nick Blake in front of the whole recruit class. He called Nick Blake a quitter and a failure, telling him that if he wanted to quit, he would be better off doing it in front of the entire recruit class. At some point, Marcus Deal finally told Kyle Ritter to stop, and that there was something seriously wrong with Nick Blake, to which Kyle Ritter responded with something to the effect of "yeah, sure there is."

58. After several long minutes of not seeing any improvement with Nick Blake's vitals, an ambulance was called, and Nick Blake was sent to the Winchester Medical Center's emergency room. While waiting for the ambulance to arrive, Deputy Chief Chester T. Lauck (now deceased) took one look at Nick Blake and said, "he's in bad shape," and "you should have called the ambulance a long time ago." Nick Blake had just experienced a near-death incident. Nick would subsequently report tachycardia-like symptoms, measuring a 189 beats-per-minute heart rate despite not engaging in any strenuous activity.

59. The following week, unable to keep his heart rate down, Nick chose to resign from the recruit school. Nick reported his decision to Fire Chief Majchrzak, and the latter dictated a

resignation letter disclaiming any responsibility on the part of FCFR for Nick's decision to resign.

60. Once again, Fire Chief Majchrzak protected Kyle Ritter and allowed him to continue hazing the recruits despite repeated instances of abuse and injuries, and a near-death experience with Nick Blake.

61. Following Nick's collapse and transportation to the hospital, on March 4, 2022, Nick's mother, Casey Blake ("Ms. Blake"), who was serving as an Administrative Assistant to the Fire Chief, approached Chief Majchrzak and warned him of Kyle Ritter's dangerous hazing behavior and its resulting in Nick's medical emergency. Fire Chief Majchrzak reported to Ms. Blake that he takes these incidents seriously and would investigate further.

62. Later that day, Fire Chief Majchrzak called Deputy Chief Keith Jenkins and Kyle Ritter into his office. They were in Majchrzak's office for approximately twenty minutes. Once Chief Majchrzak was done talking with them, he called Ms. Blake into his office and informed her that Nick Blake must have misunderstood what occurred to him.

63. Stunned, Ms. Blake asked Fire Chief Majchrzak if he had spoken with Deputy Chief Lauck or Lt. Whitacre. Defendant Majchrzak replied that he had not spoken to them and was not going to. Ms. Blake stated, "clearly you are not interested in the truth, and I guess someone will have to die for you to do something about it." Chief Majchrzak responded with a chuckle and mockingly commented that "no one is going to die." That was the end of Majchrzak's investigation into Kyle Ritter's hazing of Nick Blake and other recruits.

64. Nick Blake's near-death incident was never reported to the Virginia Occupational Safety and Health ("VOSH"), which prevented an extensive investigation into FCFR's training practices and culture of hazing its recruits.

14

*Subsequent Events After Nick Blake's Near-Death Incident*

65. Despite Nick Blake's near-death as a result of Kyle Ritter's "paramilitary" recruit school, Fire Chief Majchrzak refused to take any disciplinary actions against him or order any changes to the Kyle Ritter's "hell days."

66. As he did with recruits from previous recruit classes, Fire Chief Majchrzak continued to express his support of Kyle Ritter's training methods. In a particular instance, Fire Chief Majchrzak witnessed Kyle Ritter hand out one of his "punishments" when the recruits failed to address Majchrzak correctly. To the amusement of Fire Chief Majchrzak, Kyle Ritter berated the recruits and forced them to undergo strenuous physical exercise.

67. Following Nick Blake's near-death experience, a recruit from Recruit Class 12 underwent a similar medical emergency involving a cardiac event. Thankfully, it was not as severe as Nick's medical emergency; however, the recruit was unable to continue performing PT for the rest of recruit school and was subsequently recycled to Recruit Class 13.

68. Between Recruit Class 11 through 13, twelve (12) additional injuries were reported during physical training exercises.

69. Due to persistent injuries, recruits were warned by FCFR's senior leadership not to speak to any lawyers if any came to them with questions regarding how the injuries occurred or how the training was conducted.

70. Following repeated cardiac events during PT, FCFR chose to purchase Polar H10 Heart Rate sensors ("Polar H10") to monitor each recruit's heart rate during PT.

71. A Polar H10 is a heart rate sensor that connects and transfers data via Bluetooth to provide a real-time heart rate feed, allowing users to determine the intensity of their training. The real-

time heart rate information is relayed to an iPad or other Bluetooth-connected device through

the Polar Beats app. There are five (5) heart rate zones, and they are as follows:

   a.   Zone 1 illustrates a 'Very Light' intensity workout, which is marked by a color
        identifier with the color 'Gray.' Gray zone workouts typically exert 50-60% of an
        individual's maximum heart rate.

   b.   Zone 2 illustrates a 'Light' intensity workout, which is marked by a color
        identifier with the color 'Blue.' Blue zone workouts typically exert 60-70% of an
        individual's maximum heart rate.

   c.   Zone 3 illustrates a 'Moderate' intensity workout, which is marked by a color
        identifier with the color 'Green.' Green zone workouts typically exert 70-80% of
        an individual's maximum heart rate.

   d.   Zone 4 illustrates a 'Hard' intensity workout, which is marked by a color
        identifier with the color 'Orange.' Orange zone workouts typically exert 80-90%
        of an individual's maximum heart rate.

   e.   Zone 5 illustrates a 'Maximum' intensity workout, which is marked by a color
        identifier with the color 'Red.' Red zone workouts typically exert 90-100% of an
        individual's maximum heart rate.

72. An illustration of the five (5) training zones, taken directly from the Polar H10 Heart Rate
    Sensor user manual, is attached as **Exhibit 1.**

73. Providing recruits with heart rate sensors that offer a real-time feed of each user's heart rate
    ensured that recruits could engage in the strenuous physical exercise needed to become
    firefighters without overexerting themselves and causing cardiac events similar to Nick

Blake's case. This, in turn, would presumably ensure that FCFR is complying with NFPA 1583 and other basic safety guidelines.

74. However, Fire Chief Majchrzak refused to remove Kyle Ritter from his post as Lead Instructor and insisted on allowing him to continue having his "hell days" with the recruits; turning a blind eye to the reality that as long as Kyle Ritter was involved in PT, an injury – even a serious injury – will occur, despite Ms. Toler's presence or how much FCFR limits Kyle Ritter's role with PT.

*Ian Strickler*

75. Ian Strickler was a 35-year-old man, residing in Luray, Virginia, alongside his parents, Alice and David Strickler, and his wife, Stephanie Fiandaca-Strickler.

76. Before the events of July 5, 2023, Ian had previously resided in Massachusetts alongside his wife, where he worked as a Special State Police Officer at Massachusetts General Hospital in Boston for several years.

77. Desiring to live closer to his family in Virginia, Ian sought employment opportunities at or near Luray, which is when he came across a job opportunity to work as a career Firefighter with FCFR. Mr. Strickler subsequently applied for the position.

78. The Fire Department initiated its lengthy hiring process, beginning with FCFR Human Resources reviewing Mr. Strickler's application for any possible reason that warrants disqualification. Upon completing this stage, Ian underwent a written exam, which is a general aptitude test that evaluates applicants' reading comprehension, mathematical skills, and decision-making abilities. Applicants must pass the written examination with a score of 60% or higher to move on to the next step.

79. Upon completing the written exam, Ian underwent a Physical Agility Test, which consists of seven (7) stages that evaluate applicants' ability to perform essential job functions and tasks at incident scenes. Applicants must complete the test within the 12:30 time limit to move on to the next step. Ian successfully completed the Physical Agility Test.

80. Shortly thereafter, Ian underwent a panel interview. On March 20, 2023, the FCFR offered Ian a position as a Fire Recruit, contingent upon his successful completion of a background check, polygraph examination, and medical clearance. The latter entails undergoing a thorough medical screening, including laboratory and cardiovascular evaluations, to ensure applicants are physically healthy and capable of becoming firefighters or EMTs.

81. On May 8, 2023, Mr. Strickler underwent an exhaustive physical examination, which included laboratory work, an electrocardiogram, a urine toxicology screen, chest x-ray, pulmonary function testing, and a staged exercise cardiac stress test. The latter test is assessed by a non-invasive exercise stress test, which is designed to determine if a person has coronary artery disease and is at risk for a heart attack. His testing revealed no indications of any pre-existing coronary heart disease that would place Ian at risk of suffering a sudden cardiac event or death.

82. Despite having a history of hypertension, which has been controlled all his life with proper medication, all other tests resulted in normal readings. Ian's tests revealed that he showed no significant forms of obstructive or restrictive airway disease, which would predispose him to a myriad of health problems. Furthermore, his laboratory results came back normal and did not show any electrolyte abnormalities that would predispose him to sudden cardiac events or death.

83. In addition to these examinations, Ian provided blood pressure readings, which demonstrated that his blood pressure was within acceptable parameters.

84. Ian Strickler's medical files and test results were submitted to FCFR's Dr. Avery Gibbs, a board-certified primary care physician specializing in Internal Medicine. Upon reviewing the submitted documentation, Dr. Gibbs approved Ian for full operational status. A copy of the Medical Clearance Form is attached as **Exhibit 2.**

85. Shortly after undergoing an exhaustive physical examination, Ian and his wife relocated to Luray to temporarily reside with his parents, as he eagerly anticipated the start of a new chapter in his life as a firefighter.

86. Upon learning that Ian Strickler had been medically cleared for full operational status, Kyle Ritter formally offered him acceptance into FCFR's recruit school program on June 16, 2023. Ian's official start date was set for July 3, 2023, and he was to be a part of Recruit Class 14. A copy of Mr. Strickler's acceptance email from FCFR is attached as **Exhibit 3.**

87. As with every previous recruit class, Ian's first day was marked with orientation. No PT was given on this day. No class was held on July 4, 2023, in observance of Independence Day. Ian was set to begin his first day of PT in Kyle Ritter's "hell day" the following morning, July 5, 2023.

88. Notably, one of the "recruits" of Recruit Class 14 was Adam Sisler. Prior to the start of Recruit Class 14's orientation, Adam Sisler had already been a firefighter for FCFR for several years. Known as a "gym-nut" for his intense physical training, Kyle Ritter chose to incorporate Sisler as an undercover recruit to push the other recruits harder, embarrass them, and overall, haze them. This was achieved by having Sisler take the lead on several exercises,

utilizing his physical fitness so that Kyle Ritter could then embarrass and berate the other recruits who struggled to keep up with him.

*Heat Index*

89. Before commencing Recruit Class 14's first day of PT, Kyle Ritter observed the forecasted temperature and noted that the projected heat index could present a problem for the recruits.

90. The heat index, also known as the apparent temperature, is the temperature that the human body perceives when relative humidity is combined with air temperature. Air temperature is measured in the shade. However, air temperature can increase by 10-15º when measured in direct sunlight due to the effect of sun rays on the human body. Therefore, the actual air temperature and the "feels like" temperature can differ significantly depending on whether one is standing in direct sunlight or the shade.

91. These significant discrepancies between the air temperature and the "feels like" temperature have a drastic impact on the overall heat index, or how "hot" the weather feels. For example, if weather services claim that the air temperature is 80°F, then that means it is 80°F *in the shade.* If someone is exposed to direct sunlight, then the temperature can increase to 90-95ºF before accounting for humidity. Assuming it is 80°F with 60% humidity, the heat index would be 82°F *in the shade*. However, if the temperature is 95ºF (due to direct sunlight) with 60% humidity, the heat index would be 110ºF.

92. The measured heat index temperatures are calculated using the National Weather Service ("NWS") Heat Index chart. A copy of the NWS Heat Index chart is attached as **Exhibit 4.**

93. Accordingly, the NWS has provided several classifications corresponding with the heat index and its effect on the body. A copy of the NWS classification chart is attached as **Exhibit 5**.

94. As part of his required training to become a certified instructor, Kyle Ritter would have been acquainted with VDFP's policy and procedure manuals. More specifically, he would have been aware of VDFP's "Outdoor Training Activities During Extreme Weather Conditions" policy manual (hereinafter referred to as "Extreme Weather Conditions"). This policy was promulgated by VDFP to assist instructors in making "reasonable judgments and decisions with regard to outdoor training activities under extreme weather conditions." A copy of the policy manual is attached as **Exhibit 6**.

95. According to the VDFP's "Extreme Weather Conditions" policy, "outside training activities requiring physical activity . . . *shall not* be conducted when the heat index reaches more than 110ºF." Furthermore, the policy states that special consideration should be given to the age/physical condition of individual students, as it may affect susceptibility to heat disorders.

96. According to NWS, a heat index of 110ºF is classified as dangerous, which can likely result in heat cramps or heat exhaustion, with the possibility of suffering a heat stroke due to prolonged exposure and/or physical activity.

97. As FCFR's lead instructor of its recruit school, Kyle Ritter would have been acutely aware of the VDFP's "Extreme Weather Conditions" policy, and the dangerous effects that prolonged heat exposure could have on an individual.

98. In fact, as he later admitted to the Strickler family several months after Ian's death, he *was* aware that the heat index could rise to unbearable temperatures but miscalculated how quickly it was reached.

*Events of July 5, 2023*

99.  July 5, 2023, marked Mr. Strickler's second day on the job and his first day of physical training. That morning, at 0600 HRS, Recruit Class 14 reported to "the annex," the building where recruits conduct most of their indoor physical training, to begin their day of training. There, they were provided instructions for the events to follow. The recruits were subsequently loaded into a bus and were transported to OneLife Fitness to have their "Inbody" performed by OneLife Fitness Instructor Rebecca Toler.

100.  The "Inbody" is a process that measures the person's body composition and shows their water weight, body fat, muscle mass, and more. Mr. Strickler's "Inbody" measurements were taken at 0639 HRS. His measurements were followed by a series of flexibility tests performed by Ms. Toler.

101.  While the recruits were at OneLife Fitness awaiting their "Inbody" measurements, they were instructed by Kyle Ritter to form a single-file line, face directly ahead, and refrain from communicating with one another. This was the beginning of Kyle Ritter's "paramilitary" style training and hazing of the recruits.

102.  Upon completing each recruit's "Inbody" measurements, the class was subsequently loaded onto the bus again to return to "the annex." These events occurred at approximately 0700HRS.

103.  Upon returning to "the annex," the recruits were instructed to line up in the hallway to receive further instructions. Kyle Ritter instructed the recruits to load water coolers and sandbags onto the bus for transportation to the FCFR's Public Safety Building for "team building exercises," a euphemism that Ritter used to refer to hazing recruits.

104. From this point forward, the training was conducted in a "paramilitary" fashion, wherein Kyle Ritter and his fellow instructors began yelling and berating the recruits when giving instructions or issuing commands.

105. In fact, earlier that day, several firefighters witnessed Steven Anderson, one of FCFR's instructors, leaving his posted fire station with a bullhorn in hand. When asked why he had it, Anderson replied that he was going to use it to "haze the shit out of some recruits."

106. At this point, the recruits were commanded to load their equipment onto the bus alongside the water coolers and sandbags. Shortly thereafter, Kyle Ritter approached the recruits and asked them how many sandbags had been loaded. Upon receiving no answer from the recruits, Mr. Ritter instructed them to unload the sandbags, count them, and reload them onto the bus. Mr. Ritter repeated this process approximately three or four times.

107. At approximately 0830 HRS, the recruits were transported to the FCFR Public Safety Building. Upon arriving, Kyle Ritter entered the bus and instructed the recruits to put on their Polar H10s. This automatically connected each recruit's heart rate readings to Ms. Toler's iPad, who was present at the Public Safety Building to keep an eye on each recruit's readings. A copy of the Polar H10 heart readings of Recruit Class 14 is attached as **Exhibit 7**.

108. At approximately 0834 HRS, Mr. Strickler placed the Polar H10 around his sternum. His heart rate was measured at or slightly above 184 beats per minute (bpm). This is already concerning because, according to various professional organizations providing physical training, such as the American College of Sports Medicine, Ian's maximum heart rate should not exceed 185 bpm. This number is determined by subtracting Ian's age from 220, which results in a heart rate of 185 bpm.

109.  The American College of Sports Medicine recommends that individuals exercise at a heart rate between 70% and 90% of their maximal heart rate. Therefore, Ian's maximal heart rate for physical training should not have exceeded 167 bpm. Yet, by 0834 HRS, Ian was already exerting 100% of his maximal heart rate, placing him within the red zone according to his Polar H10 readings. As a certified physical trainer, Ms. Toler would have been aware of the potential health problems these readings could pose for Ian. Coupled with a high heat index, Ian's health was heading down a dangerous path. A copy of Ian Strickler's heart rate reading is attached as **Exhibit 8.**

110.  Nonetheless, Ms. Toler decided to hold off informing either Ian Strickler or Kyle Ritter of his heart rate readings.

111.  At 0834 HRS, the temperature read 73ºF, but since the field surrounding the Public Safety Building was directly underneath the sun, it "felt" more like 88ºF. Coupled with 84% humidity, the heat index was approximately 110ºF. Right then, the heat index was at a temperature categorized as "dangerous" by the NWS. By stepping outside, every recruit was at risk of developing heat disorders, such as sunstroke, muscle cramps, and/or heat exhaustion.

112. With prolonged exposure and/or physical training, each recruit was susceptible to suffering from heatstroke. Kyle Ritter knew this and should have known that the heat index had already reached temperatures deemed unsafe for outside physical activity by VDFP, but he chose to ignore it and continue with his "hell day."

113.  Instead of making the call to transfer PT to the annex and have the recruits suffer Kyle Ritter's "hell day" indoors, he chose to risk their lives and push their bodies to their limits in the July heat.

114. Upon disembarking the bus, the recruits began doing stretches and warm-ups, conducting lunges with sandbags around their shoulders and lunging approximately ninety (90) feet away. The class followed this exercise with toe touches, repetitive pushups, squats without a sandbag, squats with a sandbag, sandbag lifts, and a water bottle exercise where the recruits' water bottles were deliberately scattered across a long-stretch of the field and they had to work together to locate them before being granted permission to take a water break. These exercises were led by Adam Sisler, whose superior physical fitness capabilities in comparison to the rest of the recruits provided Kyle Ritter ample reason to berate and scream at the recruits.

115. At various stages of these exercises, Kyle Ritter repeatedly screamed at the recruits, calling them demeaning and derogatory names and threatening them that if they failed to keep up, they would be dismissed from recruit school. Steven Anderson exacerbated Kyle Ritter's hazing by shouting at them through a bullhorn while barely standing a few feet away from the recruits.

116. Ian Strickler feared the consequences of giving up and was eager to prove himself to FCFR instructors.  Ian Strickler powered through the grueling PT exercises, knowing that he had been medically cleared to undergo PT and believing that his health would be protected by the experienced FCFR instructors and the Polar H10 technology that was being used to monitor the recruits.

117. Surveillance cameras around the Public Safety Building captured the recruits beginning their water break at 0900 HRS. They were about to begin their next exercise, which started with bear crawls. The timing of the video indicates that the toe touches, squats without sandbags, squats with sandbags, and the subsequent scattered water bottle exercises were

completed before the water break, which means that Kyle Ritter trained them for nearly thirty (30) minutes without intervals or water breaks, which violates VDFP's "Extreme Weather Conditions" policy limiting strenuous physical activity to 15 or 20 minutes.

118. During the 0900 HRS water break, Ms. Toler can be seen on video talking to Ian about his elevated heart rate, which had not fallen below 195 BPM, according to the Polar H10 sensors, exceeding the Red Zone workouts.

119. Ms. Toler did not inform Ian of the danger associated with his heart rate readings, but asked him if he was feeling lightheaded, nauseous, or in pain. Ian indicated that he was not experiencing any of those symptoms at that time.

120. Ms. Toler can then be seen leaving after speaking with Ian and walking towards a group of instructors. Ms. Toler approached Kyle Ritter and presented him with Mr. Strickler's heart rate readings. Ms. Toler told Kyle Ritter that Ian's heart rate was exceeding normal heart rate readings, and that his heart was beating in excess of 100% percent of an individual's maximum heart rate. Ms. Toler pointed to Ian's heart rate beating within the Red Zone of the Polar H10 monitoring sensors.

121. Despite having overseen at least two previous cardiac events involving PT, Kyle Ritter dismissed Ms. Toler's concerns and proceeded to line up the recruits for the second stage of their workouts, which began with bear crawls. Video surveillance captured the moment the recruits started the bear crawl exercise. Within two feet of beginning his bear crawls, Ian Strickler can be seen dropping onto his hands and knees. At this point, Kyle Ritter approached Ian, squatted near his face, and began yelling at Ian to "get off your knees" repeatedly and in a demeaning tone. Kyle Ritter forced Ian to complete the lap.

122. Upon completing one lap of bear crawls, Ian fell to his knees again and continued crawling in this manner until Kyle Ritter approached him and yelled at him to get off his knees. Again, Mr. Ritter forced Ian to finish the exercise despite knowing that his heart rate was well into dangerous levels.

123. Once the recruits completed their bear crawls, they began a stretching exercise in which they were instructed to assume a push-up position with their buttocks pushed towards the sky. Upon completing their stretch, Kyle Ritter instructed the recruits to get on their feet, but when the class failed to complete this in unison, he ordered them to repeat the process several times.

124. Immediately thereafter, the recruits were then instructed to resume a push-up position, in which, when commanded to get "up," they had to explode onto their feet. When commanded to get "down," the recruits had to drop back onto the push-up position. This exercise lasted for several minutes. By the time the recruits completed the exercise, it was 0908 HRS. The recruits were then commanded to begin their run around the Public Safety Building.

125. During this second portion of the recruits' morning PTs, Ms. Toler approached Kyle Ritter several more times, indicating to Ritter that Ian Strickler's heart rate was not dropping but maintaining the same dangerously high levels he was displaying earlier that morning. Again, Kyle Ritter disregarded these signs and continued pushing Ian beyond his limits, while shouting at him and berating him to continue moving forward.

126. By this time, the air temperature was slowly rising, increasing the heat index from 110°F to 116°F.

127.  Shortly after beginning their run, Ian Strickler began to falter and fall behind the rest of the
      recruit class. Despite being repeatedly told by Ms. Toler that Ian Strickler was suffering
      from an abnormally high heart rate, Kyle Ritter forced Ian to the front of the class to lead
      the pace of the run.

128.  Ian Strickler's average heart rate was 199 bpm during this time (108% of his maximum
      safe bpm) with a high a 208 bpm (113% of his maximum safe bpm).

129.  At approximately 0912 HRS, Ian collapsed onto the ground during this run. Witnesses
      described Ian as having "heavy legs" or "newborn giraffe" legs when he fell. Upon falling,
      Kyle Ritter yelled to the other recruits to continue with their run, while he and two other
      instructors tended to Ian. Shortly before collapsing, Ian complained of knee pain, which
      Kyle Ritter dismissed.

130.  Upon collapsing, Kyle Ritter asked Ian if he was experiencing shortness of breath,
      dizziness, or feelings of passing out, to which Ian responded that he was not experiencing
      any of those symptoms. Ian was then relocated to the west side of the Public Safety
      Building, where he once again came into view of the video surveillance camera.

131.  By this time, the heat index had risen to 116º-124ºF.

132.  Once relocated, Ian was then given a drink and seated on a curb. No medical bag was
      nearby and had to be retrieved from a parked vehicle hundreds of feet away. Shortly
      thereafter, Kyle Ritter noticed that Ian was slumped over and breathing in a snore-like
      manner. This type of respiration is known as Agonal breathing, and it is indicative of
      someone approaching death.

133.  Kyle Ritter got behind Ian and began giving him sternum rubs, while two other instructors
      helped tilt Mr. Strickler's head back to open an airway. While Ian's head was tilted back,

his eyes rolled into the back of his head. Shortly thereafter, Ian became unresponsive. Life-saving measures were initiated. At around 0922 HRS, Frederick County dispatch was notified of an urgent request for medical emergency services at the Public Safety Building. An ambulance team was dispatched from the FCFR's Milwood Station, which is located 0.8 miles away from the Public Safety Building.

134. EMTs arrived shortly after the dispatch was sent out. The crew members included the following:

   a. Michael Wilkins, Jr., an EMT.

   b. Connor Recko, an Advanced EMT.

   c. Curtis Kasinski, an EMT.

   d. Nathan Keen, an EMT.

   e. Kyle Coates, an EMT-Paramedic.

   f. Amie Fuller, an EMT-Paramedic.

135. For the next several minutes, EMTs began obtaining vitals and collecting testimonies from various witnesses, who reported that Ian felt "extremely hot to the touch." A large bag of ice was placed onto his chest to cool him.

136. EMTs proceeded to load Ian onto the ambulance and hooked him up to a cardiac monitor, which showed his heart rate beating at 90 BPM. Within a short period, Ian's heart rate drastically fell from 90 BPM to 60 BPM, and then to 30 BPM. Ian was immediately prepped for transportation to the nearest hospital's emergency room.

137. At 0930 HRS, Ian was transported to Winchester Medical Center. During his transit, Ian entered cardiac arrest, and life-saving measures were administered. His body temperature was recorded at 104ºF.

138. At 0939 HRS, Ian arrived at Winchester Medical Center. By this point, Ian's heart was flatlining, and emergency room personnel quickly attempted to continue administering life-saving measures. An EMT crew member notified the ER doctor of Ian's vitals, including his elevated body temperature of 104°F.

139. At 0952 HRS, resuscitation efforts were terminated, and Ian Strickler was declared deceased.

140. Ian's Prehospital Care Report was later finalized for Ian's autopsy. However, despite notifying the ER doctor of Ian's body temperature of 104ºF, it was not listed in the temperature column on the copy of the report given to the medical examiner. It would later be revealed that Ian's temperature was intentionally omitted in anticipation of Ian's autopsy and VOSH's investigation.

*Ian Strickler's Autopsy*

141. On July 6, 2023, Assistant Chief Medical Examiner Dr. Carmen D. Coles completed an autopsy on Ian Strickler to determine the cause of death. Based on the information provided through his pre-employment physical exam, Dr. Coles hypothesized several causes of death, including:

    a.  Pulmonary Embolus;

    b.  Essential Heat Stroke/Heat Stroke;

    c.  Non-heat stroke related cardiac arrythmia;

    d.  Myocardial infarction from underlying coronary artery disease;

    e.  Certain heart structural defects, such as hypertrophic cardiomyopathy;

    f.  Neuro-malignant Syndrome; and

g.  Rare others.

142. Dr. Coles's autopsy report revealed several notable findings. Dr. Coles reported that Ian's coronary arteries were not obstructed, ruling out myocardial infarction. No blood clots were found in his lungs, which ruled out a pulmonary embolism. Ian was noted to have an enlarged heart and left ventricular hypertrophy, but nothing that would put him at risk for sudden cardiac arrhythmia, unless he was exposed to extreme physical activity with an inability to shed excess heat, which is an example of a classic heat stroke.

143. Heat stroke is a medical emergency brought on by rigorous physical activity resulting in overexertion, which can result in death if left untreated. Due to the typical conditions under which it is normally brought, essential heat strokes specifically target athletes, firefighters, soldiers, and others who are exposed to strenuous physical activity. Heat stroke can also result from very high ambient air temperatures, with or without strenuous activity.

144.  For heat stroke victims, death can occur when the body cannot shed excess heat in the form of sweat or aggressive cooling. Once this happens, a victim's body temperature begins to rise, leading to rapid organ dysfunction, electrolyte disturbances, and arrhythmia. Signs of someone suffering from a heat stroke include profuse sweating, profound tachycardia (abnormally high heart rate), delirium, and, if left untreated, death. Reports of extreme heat emanating from the victim are indicative of heat stroke.

145. Unfortunately, since Ian's body temperature was not transcribed in the Prehospital Care Report, Dr. Coles had no definitive metric to rely upon to make a more concrete pronouncement. As a result, upon observing Mr. Strickler's mild ventricular hypertrophy (which is seen in patients with uncontrolled hypertension) and a slightly enlarged heart, Dr.

Coles concluded that Mr. Strickler died because of Hypertensive Cardiovascular Disease, or in other words, complications with his blood pressure.

146. The omission of Mr. Strickler's 104ºF body temperature from the Prehospital Care Report was a significant factor in Dr. Coles' conclusion.  Had this information been known to Dr. Coles or anyone else attempting to determine the cause of death, it would have provided a definitive metric to conclude that Mr. Strickler died because of heat stroke brought upon by strenuous physical exertion at the hands of Kyle Ritter.

147. A subsequent medical case review conducted by a medical doctor in connection with Mr. Strickler's workers' compensation claim concluded that Ian Stricker did in fact die from heat stroke, not cardiovascular disease.

*VOSH Investigation into Ian Strickler's Death*

148.  On July 5, 2023, at approximately 1400 HRS, FCFR Deputy Chief Larry Oliver called the regional VOSH office to report a fatality at the Public Safety Building. The Regional Director directed Compliance Safety and Health Officer Joshua Strickler (no relation to Ian Strickler), to conduct an investigation and inspection of the site on July 7, 2023.

149. Investigator Strickler immediately pulled up weather services to check the temperature in Winchester, Virginia. At 1406 HRS, the temperature read 96°F with a heat index of 119°F.

150. On July 7, 2023, at approximately 0930 HRS, Investigator Strickler arrived at the site and met with Deputy Chief Oliver. Throughout the day, Investigator Strickler was provided with information pertaining to FCFR's recruit school, its application process, training programs, witnesses, and a summary of the events involving Ian Strickler and the incidents that unfolded on July 5, 2023.

151. Despite FCFR's offer to provide Investigator Strickler with all the information he needed to complete his report, Investigator Strickler came to the impression that FCFR's senior leadership was intentionally impeding the investigation by failing to disclose the whole truth of what had occurred. Investigator Strickler noticed discrepancies in the testimony of various witnesses and a general reluctance to share information.

152. A notable example was identifying who took Ian Strickler's body temperature when he was transported to the hospital. Despite the ER doctor confirming he received it from one of the EMTs, no single EMT personnel in the ambulance would provide Investigator Strickler with an answer as to who took Ian's temperature.

153. Unbeknownst to Investigator Strickler, senior leaders within FCFR were discussing amongst themselves the contents of VOSH's investigation and how to handle it properly. FCFR's administrative assistant to the Fire Chief, Casey Blake, overheard many of these conversations, including limiting Investigator Strickler to interviewing a select number of people. It became evident to her that FCFR was primarily focused on protecting itself from liability rather than uncovering the truth.

154. On July 13, 2023, a funeral service was held in honor of Ian Strickler. At one point, Ian's mother, Alice Strickler, cried out for her son, begging to understand what occurred. Following the service, Alice Strickler was approached by Steven Anderson and other FCFR instructors (excluding Kyle Ritter), who profusely apologized for what had happened to Ian. Unaware of their involvement in Ian's death, Alice Strickler was confused as to why they were apologizing to her. This was the impetus for Casey Blake's decision to submit an anonymous letter to the Strickler family, with the hope that it would reach Investigator Strickler. A copy of the then-anonymous letter is attached as **Exhibit 9.**

155. Shortly thereafter, Investigator Strickler received the anonymous letter through the Strickler family. Investigator Strickler was shocked to read that not only was FCFR limiting the flow of information, but that a fire recruit from a previous class nearly died while undergoing similar training to Ian Strickler and that FCFR did not report the earlier incident to VOSH. Eager to learn more about FCFR's training practices and potential witnesses involving Ian Strickler's death, he encouraged the Strickler family to seek out the anonymous author, so that he may learn more about FCFR's practices.

156. Shortly thereafter, in August 2023, Investigator Strickler established contact with Casey Blake and her son, Nicholas Blake, who was referenced in the then-anonymous letter as the recruit who almost died the year before. The pair met the following week at VOSH's regional office in Verona, Virginia, to discuss the contents of the letter.

157. In that meeting, Ms. Blake confided to Investigator Strickler that she was the author of the anonymous letter and that her son, Nick Blake, was the recruit who almost died as referenced in the letter. This was notable to Investigator Strickler because Nicholas Blake's injury was not reported to VOSH as required under law. Beyond this revelation, Ms. Blake provided Investigator Strickler with names, dates, and sources of information being withheld by FCFR that would facilitate VOSH's investigation into Ian Strickler's death.

158. Investigator Strickler explained that, prior to receiving the letter, he was about to close the investigation due to a lack of evidence, despite feeling that people within the Fire Department were not being truthful with him. Based on the information contained in Ms. Blake's letter and their conversation in Verona, Investigator Strickler decided to keep the investigation open and continue interviewing more people within FCFR.

159. Now armed with new information, Investigator Strickler returned to questioning some of the same individuals he initially interviewed and new witnesses, and his findings corroborated what Ms. Blake told him in Verona.

160. Investigator Strickler's renewed efforts to investigate Ian Strickler's death resulted in a previously undisclosed video of Ian Strickler's training on the morning of his death, which shows the blatant disregard for safety protocols by FCFR and Kyle Ritter, which led directly to Ian Strickler's death.

161. Investigator Strickler periodically communicated with Ms. Blake to facilitate a better understanding of the chain of events that led to Ian Strickler's death, the Fire Department's response, the names of individuals who possessed key information, and the Fire Department senior leadership's knowledge of the operation of its recruit school, and Kyle Ritter's leadership and managing of the recruits.

162. It was through Casey Blake's cooperation that Investigator Strickler uncovered that FCFR ran its recruit school like a "paramilitary" boot camp, where Kyle Ritter encouraged his fellow cadre of instructors to break down the recruits through strenuous physical exercise and verbal harassment, ultimately for the ostensible purpose of building them back up stronger. It was through these conversations that he learned that FCFR's senior leadership, specifically Fire Chief Majchrzak, were repeatedly warned by Casey Blake and other career personnel that Kyle Ritter's handling of the recruits would ultimately result in someone's death.

163. Throughout this process, Investigator Strickler asked FCFR Deputy Chief Oliver if FCFR maintains any in-house physical fitness or training policies. Deputy Chief Oliver stated that FCFR does not but instead follows the standard policies and procedures promulgated by

VDFP. The only item that FCFR provides outside of regular VDFP material is the Recruit Class Information and Policies Manual, 2023-2024, which includes general information about FCFR's recruit school curriculum, with a small portion dedicated to physical fitness. However, it does not contain any additional information beyond what VDFP maintains.

164. Through an in-depth review of VDFP policies and procedures, Investigator Strickler learned of VDFP's "Extreme Weather Conditions" policy prohibiting outside physical training when the heat index reaches 110ºF and limiting strenuous physical workouts to 15-20-minute intervals. Investigator Strickler also learned of NFPA 1583, which requires all physical training to be conducted by a certified physical trainer, in contrast to FCFR's repeated choice of permitting Kyle Ritter to run select days of PT despite not being a certified physical trainer. Furthermore, Investigator Strickler uncovered FCFR's long history of reported injuries relating to PT under Kyle Ritter's supervision and its overall reluctance to dismiss Kyle Ritter from his post despite the obvious danger he presented to recruits.

165. Investigator Strickler's conversations with Casey Blake renewed and reinvigorated his investigation, which caught many FCFR senior leaders by surprise. Questions began to spiral from the Fire Department's senior leadership regarding how VOSH could identify key sources of information and conduct depositions with key personnel, after previously indicating that the investigation was over.  FCFR senior leadership, including Fire Chief Majchrzak, began to suspect that someone was providing VOSH with information on what had occurred to Ian Strickler, including the inner workings of the Fire Department.

166. With his new findings on what occurred on July 5, 2023, coupled with knowledge of VDFP and NFPA standards and FCFR's history of reported injuries, Investigator Strickler

concluded that FCFR willfully violated its statutory duties to furnish its fire recruits with a safe employment free from recognized hazards that were causing or are likely to cause death or serious physical harm. In particular, he noted that FCFR failed to protect Ian Strickler by exposing him to excess heat while engaging in outdoor training exercises, despite repeated opportunities for Kyle Ritter to pull him from training upon being notified of Ian Strickler's heart rate and his knowledge of the correlation between a high heat index and the possibility of suffering a heat stroke with prolonged exposure.

167. Investigator Strickler's findings were submitted to senior leadership within VOSH for review. On December 27, 2023, VOSH issued a Citation and Notification of Penalty to FCFR, finding that it failed to protect its employees as required under state law. A copy of the Citation and Notification of Penalty is attached as **Exhibit 10.**

*Strickler Family's Conversation with Kyle Ritter*

168. On September 8, 2023, Kyle Ritter met with the Strickler family to discuss the events surrounding Ian's death. Ian's mother, Alice Strickler, began the conversation by referencing Casey Blake's then-anonymous letter, referring to it as containing "pretty powerful things," including how Ian's death was preventable.

169. She followed this statement by asking why Ian was not stopped, despite every indication from his heart rate sensor warning that he was overexerting himself. To this, Kyle Ritter responded by dodging a direct response and stating that Ian had been asked if he felt okay.

170. Alice Strickler responded to this statement by asking Kyle Ritter if either he or Ian was the trainer. She followed up by explaining that Ian's heart rate should not have exceeded 185 bpm, and that his 104ºF body temperature was indicative of a serious problem.

171. Kyle Ritter responded, acknowledging how the heart rate sensors work, but admitting that he was not aware of what their exact readings mean because he had "never personally sat down and read the instructions."

172. Throughout their conversation, Kyle Ritter made it evidently clear that he was not aware of the proper protocols for situations such as Ian's and expressed doubt about whether he, FCFR's lead instructor, had the authority to remove Ian upon seeing his elevated heart rate.

173. To this, Alice Strickler responded that Kyle Ritter had no place in recruit school, to which the latter agreed. Alice Strickler followed this by stating that he should seek another post within FCFR, to which Kyle Ritter responded, "Yeah, I've been told that multiple times."

174. Kyle Ritter followed up by admitting fault for what happened to Ian and expressing agreement that FCFR needed a fundamental change in how it runs its recruit school.

175. Alice Strickler then asked why Kyle Ritter chose to have the recruits do their PTs outside when July 5th was predicted to be one of the hottest days of the month. Kyle Ritter acknowledged the heat issue and explained that both he and Steven Anderson reviewed the heat index and assured themselves that since 1300 HRS was supposed to be the hottest part of the day, they could get away with training the recruits outside in the morning, before transferring them to the annex to continue their training indoors.

176. Ultimately, Kyle Ritter expressed his regret at not stopping Ian sooner, acknowledging that FCFR had fundamental problems with its recruit school, and stating that he would no longer participate as an instructor.

*Events Following Ian Strickler's Death*

177. Following Ian's death, Kyle Ritter was transferred out of his role as FCFR's lead instructor and sent back out to the field. No other disciplinary action was taken against him, Steven Anderson, Deputy Chief Jenkins, or others for their roles in implementing a "paramilitary" training program or for their handling of the events that directly led to Ian Strickler's death.

178. On July 31, 2023, Ian's wife, Stephanie Fiandaca-Strickler, was qualified by the Circuit Court of Page County, Virginia, as the Administrator of the Estate of Ian Thomas Strickler. A copy of the court document qualifying Mrs. Strickler as Administrator of Ian Strickler's Estate is attached as **Exhibit 11.**

179. Following this, since Ian died during the course of his employment with FCFR, all state law claims related to his death were automatically transferred to the Virginia Workers' Compensation Commission (hereinafter referred to as "Virginia's Workers' Comp").

180. Under Virginia law, all injuries or deaths arising out of the course of employment are automatically transferred to Virginia's Workers' Comp, regardless of whether the person or their Estate chooses to.

181. Following the Strickler family receiving the then-anonymous letter and their conversation with Kyle Ritter, Alice Strickler sat down for an interview with The Winchester Star ("The Star") newspaper, wherein she discussed what happened to Ian Strickler and the events that followed.

182. On October 10, 2023, The Star released an article titled, '*They failed him': mother of Frederick County fire recruit who died during training speaks out*."  In it, the article recounts their conversation with Alice Strickler, discussing Ian Strickler's death and how his family believes that FCFRD failed him in preventing his death.

183. In response to Alice Strickler's statements, County Administrator Michael Bollhoefer wrote, "The entire Fire Rescue System and the County is devastated by the death of Ian Strickler. . . . The County and Fire Department is committed to an open and transparent review and have fully cooperated with the Virginia Medical Examiner in determining the nature and cause of death and with the Virginia Occupational and Safety Investigators as they review workplace safety."

184. County Administrator Michael Bollhoefer's statements regarding FCFR's cooperation with VOSH and the medical examiner are false. Investigator Strickler acknowledged that there were discrepancies in witness testimonies and a general reluctance to disclose information. Had Casey Blake not written to him, Investigator Strickler would have been forced to close the investigation, despite knowing that FCFR was obfuscating critical information, due to FCFR's unwillingness to provide the complete truth of the matter.

185. Furthermore, FCFR failed to cooperate with the medical examiner performing Ian Strickler's autopsy by willfully omitting Ian's 104ºF body temperature from the temperature column in his Prehospital Care Report. Despite acknowledging reports that Ian was "extremely hot to the touch," absent a recorded body temperature, the medical examiner was unable to properly review other hypotheses that could explain Ian's expiration, including the possibility that Ian suffered from heatstroke.

186. The following day, October 11, 2023, Alice Strickler, Stephanie Fiandaca-Strickler, and Ian's cousin, Aaron Watson, attended a Frederick County Board of Supervisors meeting. They were accompanied by Casey Blake for support. During the citizens' comments portion of the meeting, Alice Strickler rose and gave a heartfelt speech to the Board of Supervisors about how they, along with FCFR, failed her son repeatedly, leading up to his

untimely death. She noted how, despite Ian sweating profusely during the "Inbody" check-in held earlier on the morning of July 5, 2023, neither Kyle Ritter nor any of the other instructors took the situation seriously despite having EMT certifications and ostensibly being capable of recognizing someone in distress.

187.  Instead of helping Ian, Kyle Ritter and his cadre of instructors berated and pushed Ian beyond his physical limits, resulting in his death. Alice Strickler admonished FCFR for hazing Ian to the point of collapse and subsequently failing to have a medical bag nearby to tend to him. Noting the previous year's incident involving Nick Blake, Alice Strickler condemned FCFR for failing to learn any lessons and for failing to take responsibility.

188.  Alice Strickler's comments were then followed by Ian's widow, Stephanie Fiandaca-Strickler, who commented on FCFR's failures to provide Ian with proper treatment upon collapsing. Noting that Kyle Ritter wasted precious minutes providing sternum rubs instead of enacting proper cooling procedures, Mrs. Strickler admonished FCFR's lack of written procedures for situations like Ian's. Recounting a previous conversation with Fire Chief Majchrzak, Mrs. Strickler inquired about FCFR's cooling procedures, only to be shocked to learn that Fire Chief Majchrzak was unaware of any such procedures. Mrs. Strickler implored the Board of Supervisors to hold FCFR accountable, reminding them that despite firefighters recognizing the risk they take when heading out to the field, no one expects (nor should they expect) to die during training.

189.  Following Mrs. Strickler, Aaron Watson rose to speak. Against the backdrop of nearly twenty (20) years of firefighting experience, Mr. Watson acknowledged the inherent dangers firefighters face in their course of employment. Mr. Watson reaffirmed Mrs. Strickler's statement that no one should die in training. Acknowledging Kyle Ritter's long

history of hazing the recruits and the near-misses FCFR endured, Mr. Watson inquired about FCFR's true intentions with its recruit schools. Asking, "[W]ere they truly trained to be firefighters or a punching bag with no supervision or recourse." Mr. Watson implored the Board of Supervisors to make fundamental changes, recounting the various times FCFR failed to do so themselves.

190. The following day, on October 12, 2023, The Star released an article titled, "*Mother of fallen recruit, county supervisor takes aim at Frederick fire and rescue leadership.*" The article describes the events surrounding Ian Strickler's death and the previous night's Board of Supervisors meeting. In a written statement to The Star, County Administrator Michael Bollhoefer directly targeted Alice Strickler's statements, and remarked that they "have no factual basis."

191. Alice Strickler, alongside Casey and Nick Blake, decided to attend the next Board of Supervisors meeting scheduled for October 25, 2023. Prior to the start of that meeting, now-retired Fire Chief Dennis Linaburg approached the trio and confirmed that he had formed the idea of transforming FCFR's recruit school into a "paramilitary" boot camp, with Kyle Ritter at the helm due to his previous military service.

192. On October 27, 2023, The Star published another article titled "I am that recruit": In the wake of Ian Strickler's death, former fire and rescue recruit [Nick Blake] says he almost died in training in 2022." In response to some questions by the newspaper, County Administrator Michael Bollhoefer promised that Frederick County would hire a private investigator to investigate the circumstances that led to Ian Strickler's death.

193. It is unclear if Frederick County ever followed through on this promise to have an independent investigation into Nick Blake's near-death experience or Ian Strickler's death,

as neither the Sticklers nor the Blakes have received any communications or details regarding the supposed investigation.

194. On November 8, 2023, shortly after the Board of Supervisors' meetings, Stephanie Fiandaca-Strickler sent a Notice of Claim to the Frederick County Board of Supervisors. Frederick County's Board of Supervisors did not provide any response. A copy of the Notice of Claim is attached as **Exhibit 12**.

195. Sometime thereafter, as part of her job duties Ms. Blake received a set of documents to store in Ian Strickler's employee file. In it, she noticed a copy of the Prehospital Care Report. Assuming it to be an additional copy of the one on file, she was shocked to see that it contained Ian's body temperature of 104ºF in the temperature column, despite being omitted from the original report. This revelation indicates that one of the EMTs knowingly removed Ian's body temperature from the report before it was received by either the medical examiner or the VOSH investigator.

### COUNT I
### 42 U.S.C. §1983 DEPRIVATION OF RIGHTS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION
### (AGAINST ALL DEFENDANTS)

196. Plaintiff restates the allegations in the preceding paragraphs and incorporates them herein.

197. Ian Thomas Strickler is a "person" within the meaning of 42 U.S.C. §1983.  Following his death on July 5, 2023, Ian Strickler's Estate, through Administrator Stephanie Fiandaca-Strickler, stands in his place as the Plaintiff in this action.

198. Ian Thomas Strickler was employed by Frederick County as a firefighter recruit and died during the course of his employment while training in FCFR's recruit school.

199. Ian Thomas Strickler had a fundamental right to life, liberty, and freedom from arbitrary governmental action under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

200. Frederick County Fire and Rescue, Fire Chief Steven Majchrzak, and Kyle Ritter arbitrarily deprived Ian Strickler of his fundamental rights to life and liberty by willfully establishing, conducting, and leading a fire recruit program that was intended to harm recruits through various hazing measures, including punitive physical exercises, employment of demeaning and belittling language, and willful disregard of known dangers to Ian Thomas Strickler and other recruits.

201. Then-Fire Chief Dennis Linaburg and FCFR set out to construct a new recruit program that was primarily designed to make soldiers out of firefighters through a simulated "paramilitary" fire recruit program with Kyle Ritter at the helm, despite the latter's lack of certifications to run any physical training regimen, and both VDFP and NFPA prohibiting punitive training for punitive training's sake.

202. Beginning with then-Fire Chief Linaburg and continuing with Fire Chief Majchrzak, FCFR willfully disregarded the countless injury reports, explicit hazing, and lack of care in following safe training procedures that resulted under Kyle Ritter's leadership of the recruit school.

203. As the final policymaker for the Frederick County Fire and Rescue System, then-Fire Chief Linaburg and current-Fire Chief Majchrzak had multiple opportunities to remove Kyle Ritter from his post and enact other fundamental changes to FCFR's training and safety procedures.

204. Instead, then-Fire Chief Linaburg, current Fire Chief Majchrzak, and the rest of FCFR permitted and outright commended Kyle Ritter and his cadre of instructors for their training methods, despite having received multiple warnings of possible serious injury or death if Kyle Ritter were to remain in his post.

205. The repeated disregard of Kyle Ritter's hazing of the recruits by the fire chiefs and the rest of FCFR senior leadership was indicative of an established policy or custom of willful indifference and outright ratification of Kyle Ritter's physical training program, despite knowing it violated VDFP and NFPA standards and protocols.

206. Despite taking mitigating measures to reduce the likelihood of injuries, Fire Chief Majchrzak and FCFR continued to allow Kyle Ritter to run his "hell day" PTs and "punishments," even after FCFR underwent a near-miss fatality with Nick Blake and another cardiac event with a recruit from Recruit Class 12.

207. Despite recognizing the potent heat index, Kyle Ritter willfully chose to train the recruits from Recruit Class 14 outside with no shade covering. Kyle Ritter then willfully–on multiple instances– chose to haze, berate, and push Ian Strickler to continue training despite knowing his heart rate readings were dangerously high.

208. None of Kyle Ritter's actions were consistent with established protocols or procedures established by VDFP or NFPA. Many of his actions were directly contradictory to established protocols and procedures.

209. FCFR's attempt to undermine the subsequent VOSH investigation, including by omitting Ian's temperature from the temperature column of the Prehospital Care Report, is indicative of its knowledge that its standards and practices were arbitrary and without any legitimate governmental interest.

210.  Such actions, decisions, and policies of Defendants, individually, severally, and/or jointly, have been, and continue to be, taken under the color of law, and such actions, decisions, and policies have deprived the Plaintiff of his rights, privileges, and immunities secured by the U.S. Constitution and laws, in violation of 42 U.S.C. §1983, and for which liability and redress exists under 42 U.S.C. §1983.

211.  Such unlawful actions, decisions, and policies, as alleged herein, make the Defendant Frederick County fully liable to the Plaintiff under 42 U.S.C. §1983 based on the authority and decisions of Defendant Majchrzak to retain Defendant Ritter as Lead Instructor. In addition, such unlawful actions, decisions, and policies, as alleged herein, were based on the policy-making and final decision-making authority of Defendant Majchrzak and were based on the policy, custom, and practice of the Frederick County Fire and Rescue System.

212.  Such unlawful actions, decisions, and polices of Defendants, individually, severally, and/or jointly, as alleged herein, were done in a knowing, willful, deliberate, wanton, and bad faith manner, which violate an established constitutional right to be free from arbitrary governmental action, which a reasonable person would have known.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment finding that the defendants have willfully, deliberately, and wrongfully violated their statutory, constitutional, and legal obligations, and have deprived the Plaintiff of his rights, privileges, protections, and entitlements under law, as alleged herein. Plaintiff respectfully requests for compensatory and punitive damages against the Defendants in the amount of $50,000,000, jointly and severally, and that the Court enter an award of attorneys' fees against the Defendants pursuant to 42 U.S.C. §1988, as well as any other legal and equitable relief that this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on the claim presented in this Complaint.

Respectfully submitted,

   /s/ Michael T. Pritchard
Michael T. Pritchard (VSB # 65846)
Cesar M. Muir (VSB # 100430)
Hogan & Pritchard, PLLC
4101 Chain Bridge Road, Suite 300
Fairfax, VA 22030
Ph: 703-359-1000
Fax: 703-359-1002
mpritchard@thehplawfirm.com
cmuir@thehplawfirm.com