CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
July 30, 2026
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| Estate of Ian Strickler, by Stephanie Fiandaca-Strickler, Administrator of Estate, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Civil Action No. 5:25-cv-00063 |
| v. | ) ) | |
| Frederick County *et al.*, | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

In 2023, Ian Strickler, a firefighter recruit with Frederick County Fire and Rescue, died during a training exercise.  Plaintiff Estate of Ian Strickler alleges that Kyle Ritter—an instructor with an alleged history of hazing and injuring recruits—caused Strickler's death. Plaintiff seeks damages against Ritter, Fire Chief Steven Majchrzak, and Frederick County under the Due Process Clause of the Fourteenth Amendment.

This matter is before the court on Defendants Frederick County, Ritter, and Majchrzak's motion to dismiss.  (Dkt. 6.)  Because Plaintiff plausibly alleges that Ritter violated Strickler's Fourteenth Amendment rights and that Frederick County is liable for the violation, the court will deny the motion.

### I.    Background

#### A.  Factual History

Frederick County Fire and Rescue ("FCFR") is a department of Frederick County, Virginia consisting of both career and volunteer firefighters.  (Compl. ¶¶ 9–10 (Dkt. 1).)  All

firefighters are overseen by a Fire Chief. (*Id.* ¶ 10.) Sometime prior to 2016, then-Fire Chief Dennis Linaburg and Deputy Chief Keith Jenkins devised a plan to turn FCFR's recruit school into a "paramilitary" school, "designed to transform firefighters into soldiers when deployed to the field." (*Id.* ¶ 23.) To do so, Deputy Chief Jenkins recruited Lieutenant Kyle Ritter, a former United States Marine, as a training instructor. (*Id.* ¶ 26.) Ritter was selected solely "because of his prior military service," (*id.*), and was not certified to lead physical training, (*id.* ¶¶ 16–22), which Fire Chief Linaburg and Deputy Chief Jenkins allegedly knew, (*id.* ¶ 26). Ritter also knew that he lacked qualifications to lead a physical training regimen. (*Id.*) However, Ritter's certifications taught him that safe training practices for recruits required hiring certified physical trainers for any physical training program. (*Id.* ¶¶ 17–18.)

After two years as a supporting instructor, Ritter became FCFR recruit school's Lead Instructor in 2018. (*Id.* ¶¶ 27–28.) Ritter's training program—which recruits called "Kyle's House of Horrors"—was marked by "enthusiastic[] hazing" of recruits. (*Id.* ¶¶ 29, 31.) Recruits performed multiple "suicide runs across fields," climbed hills with wet sandbags, and ran long distances with little to no breaks. (*Id.* ¶ 29.) Ritter or his instructors sprayed recruits with firehoses during exercises and berated them as "losers, weak, and pathetic" through a bullhorn. (*Id.* ¶ 31.) Physical training sessions lasted from "sunrise to sunset," interrupted only by classroom instruction and meal and water breaks. (*Id.* ¶ 30.)

The intensity of the training and lack of breaks led many recruits to collapse and vomit during exercises. (*Id.* ¶ 29.) Injuries were frequent. (*Id.* ¶¶ 36–37.) One female recruit sustained so many injuries during training that "FCFR's senior leadership warned Kyle Ritter

to stop documenting injuries or otherwise lose his job as a trainer." (*Id.* ¶ 35.) Ritter's hazing led an entire recruit class to collectively report Ritter to FCFR's Human Resources department. (*Id.* ¶ 34.) On one occasion, neighboring Winchester City Fire and Rescue Department broached the possibility of conducting joint training with FCFR, but declined after witnessing "[w]ith disbelief" Ritter's "hazing and mistreatment of the recruits." (*Id.* ¶¶ 41–43.)

Around this time, Fire Chief Linaburg retired. (*Id.* ¶ 38.) Steven Majchrzak took his place as Fire Chief. (*Id.*) Fire Chief Majchrzak "would often state that not only has he seen Kyle Ritter's training style, but he also condones it and supports Kyle Ritter's decisions pertaining to" physical training. (*Id.* ¶ 39.) He would often address recruits at the start of their training sessions and "express his admiration and approval of Kyle Ritter's training methods." (*Id.*)

One FCFR employee, Lieutenant Kevin Whitacre, warned Ritter that his methods potentially endangered the lives of the recruits. (*Id.* ¶ 44.) Whitacre escalated his warning to Fire Chief Majchrzak and Deputy Chief Keith Jenkins, who disregarded his concerns and stated that recruits would not be harmed. (*Id.*) In that meeting, Deputy Chief Jenkins stated, "I stand by my marine" in reference to Ritter. (*Id.*)

In late 2021, Fire Chief Majchrzak responded to the "massive number of injuries logged by fire recruits" by contracting with a fitness club, OneLife Fitness, and OneLife Fitness instructor Rebeca Toler, to conduct physical training during recruit school. (*Id.* ¶ 46.) But Fire Chief Majchrzak "retained" Ritter "for select days of" physical training, during which Ritter "retained total discretion to train the recruits as he saw fit." (*Id.* ¶ 48.) Ritter would lead

"the early days of recruit school before responsibility was then transferred to Ms. Toler." (*Id.*)

Ritter also retained authority to deliver "punishments" to recruits for classroom infractions or

"perceived delinquencies in physical training sessions with Ms. Toler." (*Id.* ¶ 48.) Recruits

referred to the initial days of physical training as Ritter's "hell days," consisting of "the same

abusive and demeaning hazing the recruits of prior years underwent." (*Id.* ¶ 50.)

In 2022, within a year after FCFR contracted OneLife Fitness, fire recruit Nicholas

Blake was hospitalized due to a cardiac emergency he experienced while training with Ritter.

(*Id.* ¶ 51.) The training began with Ritter screaming at recruits during a run, calling them

"pussies," "faggots," and "worthless." (*Id.* ¶ 53.) Several laps into the run, Blake fell behind

the other recruits, and Ritter screamed at him using derogatory and demeaning language. (*Id.*

¶ 54.) When Blake told Ritter that he felt something was wrong, Ritter replied that he did not

care and continued to call Blake names. (*Id.*) At various points, Blake collapsed, with Ritter

continuing to scream at him to keep running. (*Id.* ¶ 55.) At one point, Ritter hoisted Blake up

by his collar, telling him to "get up before I fuck you up." (*Id.*) At another point, Blake began

having difficulty breathing, seeing, and hearing, and experienced severe chest pains. (*Id.*) He

collapsed, unable to move. (*Id.*) Blake's heart rate at this point was dangerously high. (*Id.*

¶ 56.) All the while, Ritter continued to tell Blake that he was a quitter and a failure. (*Id.* ¶ 57.)

Blake almost died and subsequently reported tachycardia-like symptoms, with a heart rate of

189 beats-per-minute without engaging in strenuous activity. (*Id.* ¶ 58.)

Blake resigned from recruit school after his high heart rate persisted. (*Id.* ¶ 59.) Blake

"reported his decision to Fire Chief Majchrzak, and the latter dictated a resignation letter

disclaiming any responsibility on the part of FCFR for Nick's decision to resign." (*Id.*)  Later, Blake's mother warned Fire Chief Majchrzak of Ritter's hazing and its contributions to Blake's medical emergency.  (*Id.* ¶ 61.)  Fire Chief Majchrzak told Blake's mother that he would investigate the incident, but—after speaking with Deputy Chief Jenkins and Ritter—told Blake's mother that Blake "must have misunderstood what occurred to him." (*Id.* ¶¶ 61–62.) Fire Chief Majchrzak stated that he would not speak to other individuals to investigate the incident further. (*Id.* ¶ 63.)  Blake's injury was not reported to the Virginia Occupational Safety and Health Program ("VOSH"), "which prevented an extensive investigation into FCFR's training practices and culture of hazing its recruits." (*Id.* ¶ 64.)  After Blake's medical emergency, Fire Chief Majchrzak did not discipline Ritter or ask Ritter to modify his "hell days." (*Id.* ¶ 65.)  Fire Chief Majchrzak expressed continued support for Ritter's methods and would watch with "amusement" as Ritter put recruits through strenuous exercise. (*Id.* ¶ 66.)

Sometime later, another recruit experienced a cardiac medical emergency.  (*Id.* ¶ 67.) Twelve injuries in total were reported across three recruit classes.  (*Id.* ¶ 68.)  Recruits were instructed by FCFR's "senior leadership" not to speak to lawyers who asked them for details of their training or how these injuries occurred. (*Id.* ¶ 69.)  After recruits experienced several cardiac events, FCFR purchased heart rate sensors to monitor each recruit's heart rate during physical training. (*Id.* ¶ 70.)

At some point near 2023, Ian Strickler, a 35-year-old resident of Luray, Virginia, applied for a position as a career firefighter at FCFR. (*Id.* ¶ 77.)  After an application and interview process, Strickler was offered the position of Fire Recruit. (*Id.* ¶ 80.)  Strickler subsequently

underwent a required physical examination, which revealed no indication of preexisting coronary heart disease.  (*Id.* ¶ 81.)  The tests revealed no other abnormalities or predispositions to sudden cardiac events.  (*Id.* ¶¶ 81–83.)  A doctor approved Strickler for full operational status.  (*Id.* ¶ 84.)

On June 16, 2023, Ritter formally offered Strickler a place in Recruit Class 14, with a start date of July 3, 2023.  (*Id.* ¶ 86.)  Physical training was set to start on the morning of July 5.  (*Id.* ¶ 87.)  Among Strickler's ostensible classmates was Adam Sisler, a veteran FCFR firefighter known for his intense fitness regimen, whom Ritter planted in the class to set the pace on exercises so that Ritter could berate recruits for failing to keep up.  (*Id.* ¶ 88.)

Before the first day of training, Ritter noted that the projected heat index—or apparent temperature—might pose a problem for recruits.  (*Id.* ¶ 89.)  The National Weather Service classifies a heat index of 110ºF as dangerous, posing the risk of heat stroke with prolonged exposure or physical activity.  (*Id.* ¶ 96.)  The Virginia Department of Fire Programs ("VDFP") policy states that outside physical training should not be conducted when the heat index exceeds 110ºF.  (*Id.* ¶ 95.)  Plaintiff alleges Ritter would have known about this policy and the risks of exercising in a high heat index.  (*Id.* ¶ 97.)  Ritter admitted to the Strickler family months later that he knew on July 5 that the heat index could climb to unbearable levels, but that he miscalculated how quickly it would get there.  (*Id.* ¶ 98.)

Ritter began the morning of July 5, 2023, by hazing recruits, including by ordering them into a single-file line and forbidding them from speaking with one another while waiting for their body composition to be measured.  (*Id.* ¶¶ 99–101.)  Ritter and his instructors delivered

their instructions by yelling at and berating recruits.  (*Id.* ¶ 104.)  One instructor left his station that morning carrying a bullhorn, stating that he intended to "haze the shit out of some recruits."  (*Id.* ¶ 105.)  At one point, Ritter ordered recruits to load and unload sandbags on and off a bus three or four times over.  (*Id.* ¶ 106.)

At approximately 8:30 a.m., the recruits were bused to FCFR's Public Safety Building, and Ritter directed the recruits to put on heart rate sensors, which linked their heart rates to an iPad monitored by Toler.  (*Id.* ¶ 107.)  When Strickler strapped his sensor on at 8:34 a.m., his heart rate already registered at or slightly above 184 beats per minute.  (*Id.* ¶ 108.)  This was virtually Strickler's maximum heart rate, exceeding his recommended ceiling of 167 beats per minute.  (*Id.* ¶¶ 108–09.)  Toler did not mention this to Strickler or to Ritter.  (*Id.* ¶ 110.)

By 8:34 a.m., the heat index reached approximately 110ºF.  (*Id.* ¶ 111.)  Ritter "chose to ignore" this and did not move the session indoors to the annex.  (*Id.* ¶ 113.)  Instead, the recruits began exercises, including sandbag lunges, toe touches, push-ups, and squats.  (*Id.* ¶ 114.)  Sisler led the exercises, whose pace gave Ritter an excuse to scream at and demean the recruits.  (*Id.* ¶¶ 114–15.)  Ritter trained the recruits for roughly thirty minutes without pause, in violation of VDFP's policy limiting strenuous physical activity in such weather conditions to fifteen to twenty minutes.  (*Id.* ¶ 117.)

During the break, Toler informed Strickler about his heart rate, which had not dropped below 195 beats per minute.  (*Id.* ¶ 118.)  She did not tell Strickler that his readings were dangerous, but asked only whether he felt lightheaded, nauseated, or in pain.  (*Id.* ¶ 119.)  Strickler said he did not.  (*Id.*)  Toler then showed the readings to Ritter and told him Strickler's

heart was beating above 100 percent of his maximum rate. (*Id.* ¶ 120.) Ritter dismissed her concerns and lined the recruits up for bear crawls, despite having witnessed at least two cardiac events in prior trainings. (*Id.* ¶ 121.)

Strickler started bear crawls but almost immediately dropped to his hands and knees. (*Id.*) Ritter squatted beside his face and yelled at him to "get off [his] knees." (*Id.*) When Strickler fell to his knees again on the next lap, Ritter forced him through it once more "despite knowing that his heart rate was well into dangerous levels." (*Id.* ¶ 122.) More exercises followed. (*Id.* ¶¶ 123–24.) By 9:08 a.m., the recruits were ordered to run laps around the building. (*Id.* ¶ 124.)

Throughout this second block of exercises, Toler returned to Ritter several times to report that Strickler's heart rate remained at the same high levels. (*Id.* ¶ 125.) Ritter disregarded this, shouting at Strickler to keep moving. (*Id.*) When Strickler fell behind, Ritter moved him to the front of the class to set the pace. (*Id.* ¶ 127.) During this period Strickler's heart rate averaged 199 beats per minute and peaked at 208, which was 108 and 113 percent, respectively, of Strickler's safe heart rate. (*Id.* ¶ 128.) The heat index, meanwhile, had risen from 110°F to 116°F. (*Id.* ¶ 126.)

At approximately 9:12 a.m., after complaining of knee pain, Strickler collapsed mid-run. (*Id.* ¶ 129.) Ritter ordered the class to keep running while he and two instructors tended to Strickler, asking him whether he was short of breath, dizzy, or near passing out, to which Strickler answered no. (*Id.* ¶¶ 129–30.) With the heat index now between 116°F and 124°F, the instructors moved Strickler to the west side of the building, seated him on a curb, and gave

him a drink.  (*Id.* ¶¶ 130–31.)  Ritter soon noticed Strickler slumped over and breathing "in a snore-like manner," a pattern known as agonal breathing, which can indicate that a person is near death.  (*Id.* ¶ 132.)

While Ritter administered sternum rubs, two instructors tilted Strickler's head back to open an airway.   (*Id.* ¶ 133.)  Strickler became unresponsive.  (*Id.*)  Shortly thereafter, EMTs arrived at the scene.  (*Id.* ¶ 134.)  Witnesses told the EMT crew that Strickler felt "extremely hot to the touch," and a bag of ice was placed on his chest.  (*Id.* ¶ 135.)  He was transported to Winchester Medical Center at 9:30 a.m. and suffered cardiac arrest *en route*.  (*Id.* ¶ 137.)  His body temperature was recorded at 104ºF.  (*Id.*)  He arrived at Winchester Medical Center at 9:39 a.m.  (*Id.* ¶ 138.)  Resuscitation was terminated at 9:52 a.m., and Strickler was pronounced dead.  (*Id.* ¶ 139.)

Strickler's Prehospital Care Report omitted the 104ºF reading from its temperature column.  (*Id.* ¶ 140.)  Plaintiff alleges this omission was intentional, made in anticipation of Strickler's autopsy and a potential VOSH investigation.  (*Id.*)  An autopsy was performed on July 6, 2023.  (*Id.* ¶ 141.)  But without a recorded body temperature, the doctor performing the autopsy lacked definitive data to rule that Strickler died of heat stroke.  (*Id.* ¶ 145.)  Instead, she attributed Strickler's death to hypertensive cardiovascular disease.  (*Id.*)  According to Plaintiff, had the doctor possessed evidence that Strickler's body temperature reached 104ºF, she would have had a "definitive metric" to conclude that Strickler "died because of heat stroke brought upon by strenuous physical exertion."  (*Id.* ¶ 146.)

Compliance Safety and Health Officer Joshua Strickler of VOSH—no relation to the decedent—was assigned to investigate the incident. (*Id.* ¶ 148.) Investigator Strickler came to believe that FCFR's senior leadership was impeding the investigation, given its reluctance to share information. (*Id.* ¶ 151.) Plaintiff alleges that FCFR senior leadership privately strategized to limit whom Investigator Strickler could interview. (*Id.* ¶ 153.)

Investigator Strickler completed his investigation, assisted by Casey Blake, the mother of Nicholas Blake, who provided helpful information and sources. (*Id.* ¶¶ 154–62.) Investigator Strickler concluded that FCFR had willfully violated its duty to furnish employment free from hazards likely to cause death or serious physical harm—specifically, by training Strickler in excess heat despite Ritter's notice of Strickler's heart rate and his knowledge of the link between a high heat index and heat stroke. (*Id.* ¶ 166.) On December 27, 2023, VOSH issued FCFR a Citation and Notification of Penalty for failing to protect its employees as required by state law. (*Id.* ¶ 167.)

On September 8, 2023, Ritter met with the Strickler family. (*Id.* ¶ 168.) When asked why no one stopped Strickler despite his heart sensor readings, Ritter said that Strickler had been asked whether he felt okay. (*Id.* ¶ 169.) Ritter stated that while he understood generally how the heart rate sensors worked, he did not know what their specific readings meant, having "never personally sat down and read the instructions." (*Id.* ¶ 171.) Ritter "made it evidently clear" that he did not know the proper protocols for the situation and expressed doubt as to whether he had the authority to pull Strickler from training. (*Id.* ¶ 172.) Ritter admitted fault for what happened and agreed FCFR's recruit school needed fundamental change. (*Id.* ¶¶

173–74.)  As for the decision to train outdoors that day, Ritter explained that he and another instructor had reviewed the heat index, assumed it would not peak until 1:00 p.m., and concluded they could complete outdoor training that morning before moving indoors.  (*Id.* ¶ 175.)  He expressed regret at not stopping Strickler sooner and said he would no longer serve as an instructor.  (*Id.* ¶ 176.)  Ritter was transferred out of his lead-instructor role and returned to the field.  (*Id.* ¶ 177.)

On July 31, 2023, the Circuit Court of Page County qualified Stephanie Fiandaca-Strickler as Administrator of her husband's estate.  (*Id.* ¶ 178.)  Because Ian died in the course of his employment, all related state-law claims arising from the incident were transferred automatically to the Virginia Workers' Compensation Commission.  (*Id.* ¶¶ 179–80.)

The complaint alleges that FCFR did not fully cooperate with the medical examiner and VOSH by withholding information from the investigation and omitting Ian's body temperature from the report given to the medical examiner.  (*Id.* ¶¶ 184–85.)  The County Administrator promised that Frederick County would hire a private investigator to examine the circumstances of Ian's death, but to Plaintiff's knowledge, this investigation did not occur. (*Id.* ¶¶ 192–93.)

### B.  Procedural History

Plaintiff filed its complaint in this court on July 4, 2025.  (Dkt. 1.)  The complaint brings one count against all defendants under 42 U.S.C § 1983 for deprivation of rights under the Fourteenth Amendment.  Majchrzak and Ritter are sued in both their official and individual

capacities.  (Compl. at 1.)  Defendants Frederick County, Majchrzak, and Ritter moved to

dismiss, (Dkt. 6), to which Plaintiff responded, (Dkt. 8), and Defendants replied, (Dkt. 9).

## II.    Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

sufficiency of a complaint.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

These motions do not "resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses."  *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (cleaned

up).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual

allegations to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Id.*  In its review, "a court must consider the factual allegations in the complaint as true and

draw all reasonable inferences in favor of the plaintiff."  *Bing*, 959 F.3d at 616.  But the court

need not assume the truth of any "legal conclusions, elements of a cause of action, and bare

assertions devoid of further factual enhancement."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com,
Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

For *Monell* claims, the Fourth Circuit has instructed that "[t]he recitation of facts need

not be particularly detailed, and the chance of success need not be particularly high."  *Owens
v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (citing *Iqbal,* 556 U.S. at

678; *Twombly,* 550 U.S. at 570).  "A plaintiff fails to state a claim only when he offers 'labels

and conclusions' or formulaically recites the elements of his § 1983 cause of action." *Id.* (citing *Iqbal,* 556 U.S. at 678).

### III.   Analysis

Plaintiff brings a *Monell* claim against Frederick County, Ritter, and Majchrzak, under 42 U.S.C § 1983, as well as claims against Ritter and Majchrzak in their individual capacities.[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The *Monell* framework addresses "whether a government entity is sufficiently responsible for a constitutional deprivation to hold the entity liable under § 1983; *Monell* does not bear on whether there has been a constitutional deprivation in the first place." *Robertson v. Elliott,* 315 F. App'x 473, 476 (4th Cir. 2009). If there are "no underlying constitutional violations by any individual, there can be no municipal liability." *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999), *abrogated on other grounds by Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023); *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992) ("Our purpose in citing these cases is to emphasize the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred.").

Thus, when a § 1983 claim is brought against a local government entity under *Monell*, courts must engage in a two-step inquiry, asking: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."

---

[1] Majchrzak and Ritter did not advance a qualified immunity defense regarding their individual-capacity claims. The court will thus not consider a qualified immunity defense here. *I.P. by Newsome v. Pierce*, No. 5:19-CV-228-M, 2020 WL 1976818, at *9 n.3 (E.D.N.C. Apr. 24, 2020). Additionally, Defendants' briefing does not present specific argument for why Plaintiff's individual-capacity claims against Majchrzak should be dismissed, such as a failure to establish supervisory liability. (*See generally* Defs.' Br.) The court thus will not address those arguments.

*Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (quoting

*Collins*, 503 U.S. at 120).  The court addresses each in turn.

## A. Plaintiff has adequately alleged an "underlying constitutional violation" by Ritter.

The Fourteenth Amendment to the United States Constitution provides that a state

shall not "deprive any person of life, liberty, or property, without due process of law."  U.S.

Const. amend. XIV, § 1.  This amendment "guarantees more than fair process."  *Cnty. of

Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (cleaned up).  Substantive due process "bar[s]

certain government actions regardless of the fairness of the procedures used to implement

them," including arbitrary governmental action.  *Id.* at 840, 845–46 (cleaned up).

The Supreme Court has "repeatedly emphasized that only the most egregious official

conduct can be said to be 'arbitrary in the constitutional sense.'"  *Id.* at 846 (quoting *Collins*,

503 U.S. at 129).  To establish a substantive due process violation, the challenged conduct

must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary

conscience."  *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (cleaned up).

This is because, otherwise, "there is some risk of the Clause supplanting state tort law in almost

any suit alleging that a local official has caused harm."  *Waybright v. Frederick Cnty.*, 528 F.3d

199, 204 (4th Cir. 2008).  The Supreme Court has repeatedly "spurned any approach to the

Fourteenth Amendment that would make it 'a font of tort law to be superimposed upon

whatever systems may already be administered by the States.'"  *Id.* (quoting *Paul v. Davis*, 424

U.S. 693, 701 (1976)).

- 14 -

In keeping with these principles, the Fourth Circuit and Supreme Court have laid guideposts for the type of conduct that "shocks the conscience" in a constitutional sense. In the context of substantive due process, "[t]he shocks-the-conscience test turns on degree of fault." *Id.* at 205. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849. By contrast, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* For example, the Fourth Circuit has held that in the context of firefighting training death cases, a fire department's constitutional liability "turn[ed] on whether it intended to harm the new recruits." *Slaughter v. Mayor of Baltimore*, 682 F.3d 317, 323 (4th Cir. 2012).

Conduct "falling within the middle range, following from something more than negligence but 'less than intentional conduct, such as recklessness or gross negligence, is a matter for closer calls.'" *Lewis*, 523 U.S. at 849 (cleaned up). The Supreme Court has noted that such conduct may violate the Constitution, "but only in special circumstances." *Waybright*, 528 F.3d at 205 (citing *Lewis*, 523 U.S. at 849). "As to what those special circumstances are, the Court has issued no general rule except that judges should proceed with 'self-restraint' and 'utmost care,' and make 'an exact analysis' of the circumstances presented 'before any abuse of power is condemned as conscience shocking.'" *Id.* (citations omitted).

Defendants argue that Plaintiff alleges only "negligently inflicted harm on Strickler during the new recruit program," and therefore fails to allege a constitutional violation by Ritter that "shocks the conscience." (Defs.' Br. at 6–7); *see Lewis*, 523 U.S. at 849 (noting

"negligently inflicted harm is categorically beneath the threshold of constitutional due process").

But the court is not persuaded by Defendants' argument.  Plaintiff plausibly alleges that Ritter *intended* to injure Strickler and other recruits through his training program.  Plaintiff contends that Ritter led years of methodical hazing against new recruits, (Compl. ¶¶ 29-33); that Ritter caused previous cardiac episodes in recruits, including one that nearly killed Nicholas Blake, (*id.* ¶¶ 51–58, 67); that multiple injuries resulted from Ritter's training, (*id.* ¶ 68); that Ritter threatened to "fuck [recruits] up" during training, (*id.* ¶ 55); that on the day of Strickler's death, instructors planned to "haze the shit out of some recruits," (*id.* ¶ 105); and that Ritter put Strickler through additional strenuous exercise after receiving notice of his dangerously high heart rate, (*id.* ¶¶ 125, 127).  Drawing all reasonable inferences in Plaintiff's favor, then, the court finds Plaintiff adequately pleads an "underlying constitutional injury" for purposes of its *Monell* claim and a claim against Ritter in his individual capacity.[2]

To be sure, as Defendants point out, the Fourth Circuit has stated there is "strong presumption that § 1983 due process claims which overlap state tort law should be rejected." *Waybright*, 528 F.3d at 205; (Defs.' Br. at 5 n.3.)  Ritter's conduct does overlap with potential state tort claims.  But this presumption can be rebutted when a plaintiff alleges conduct "intended to injure in some way unjustifiable by any government interest."  *Waybright*, 528 F.3d at 205 (quoting *Lewis*, 523 U.S. at 849).  That is the case here.  Unlike the plaintiff in

---

[2] These facts are also sufficient to state an individual-capacity claim against Ritter.  *See Callahan v. N.C. Dep't of Pub. Safety*, 18 F.4th 142, 145 (4th Cir. 2021) (noting that an individual § 1983 substantive due process claim requires a plaintiff to "allege both the deprivation of his life, liberty[,] or property interest by a state actor, and that the deprivation of this interest was 'arbitrary in the constitutional sense'").

*Waybright*, who failed to raise a genuine issue of material fact that the defendant intended to harm him, Plaintiff adequately alleges that Ritter intended to harm recruits during his training sessions. (*Compare* Compl. ¶ 200 *with Waybright*, 528 F.3d at 206.) Thus, while the court is cognizant that the Fourteenth Amendment does not turn "every tort committed by a state actor into a constitutional violation," *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989), Plaintiff adequately pleads an intentionally harmful—and therefore "conscience-shocking"—violation by Ritter.[3] *Slaughter*, 682 F.3d at 323 ("[T]he Baltimore City Fire Department's constitutional liability in this case turns on whether it intended to harm the new recruits.").

### B. Plaintiff has adequately alleged Frederick County's municipal liability.

The next question is whether Frederick County can be liable for Ritter's alleged constitutional injury. As a local government entity, the county cannot be vicariously liable under § 1983 for the actions of its employees. *Monell*, 436 U.S. at 691. Instead, Frederick County only faces liability under § 1983 if it "undertook the allegedly unconstitutional action pursuant to an 'official policy' or 'custom.'" *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532–33 (4th Cir. 2022). In other words, to constitute a so-called "*Monell* claim," a local government *itself*—through an official policy, decision, or custom—must have played a part in the alleged constitutional violation. *City of Okla. City v. Tuttle*, 471 U.S. 808, 817–18 (1985).

---

[3] Because the court finds that Plaintiff has adequately pleaded intentionally harmful conduct by Ritter, the court finds no occasion to determine whether this case alleges the "special circumstances" where "less than intentional" conduct violates the Constitution. *Waybright v. Frederick Cnty.*, 528 F.3d 199, 205 (4th Cir. 2008).

A policy or custom for which a local government may be held liable can arise in four ways:

1. through an express policy, such as a written ordinance or regulation;
2. through the decisions of a person with final policymaking authority;
3. through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or
4. through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up). "[P]olicymaking authority implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (cleaned up). For liability to attach, there must be "a deliberate choice to follow a course of action" as opposed to inaction by the "official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

In this case, Plaintiff alleges municipal liability under three theories: deliberate indifference, a widespread custom, and an express policy. (Compl. ¶¶ 202–03, 205; Pl.'s Resp. at 7–12 (Dkt. 8).)

1. <u>Plaintiff has alleged that Fire Chief Majchrzak possessed final policymaking authority on FCFR's policy for training recruits.</u>

Before addressing Plaintiff's theories of *Monell* liability, the court must address a threshold question: whether the Fire Chief was the "final policymaker" for Frederick County with respect to firefighter recruit training.[4] Plaintiff's three theories of municipal liability rely

---

[4] The court addressed whether Fire Chief Majchrzak possesses final policymaking authority in a different context. *Blake v. Majchrzak*, No. 5:24-cv-00068, 2025 WL 3110656, at *4 (W.D. Va. Nov. 6, 2025). Specifically, the court ruled that

on the Fire Chief functioning as the final policymaker for FCFR's recruit training policies. If the Fire Chief is not the final policymaker here, then Plaintiff's claims are likely unable to proceed.

"The question of who possesses final policymaking authority is one of state law." *Hunter v. Town of Mocksville*, 897 F.3d 538, 555 (4th Cir. 2018). As Plaintiff acknowledges, Virginia law reserves final policymaking authority to the Frederick County board of supervisors. (Pl.'s Resp. at 7.) That said, "[a] municipal agency or official may have final policymaking authority by direct delegation from the municipal lawmaking body or by conferral from higher authority." *Spell*, 824 F.2d at 1387 (cleaned up).

Plaintiff convincingly argues that Frederick County has delegated its policymaking authority to the Fire Chief. Frederick County code gives the Fire Chief the "authority, dut[y], and responsibilit[y]" to "formulat[e], administ[er], and enforce[] . . . the operational rules, regulations, and policies that will govern the FCFRS." FREDERICK, VA., ORDINANCES § 89-3. Additionally, the code tasks the Fire Chief with "[c]arrying out other duties and responsibilities as assigned by the County Administrator with regard to the provision of fire and rescue services and emergency management." *Id.* § 89-3(B)(3)(h). In other words, Frederick County has seemingly "expressly or impliedly acknowledge[d] that the [Fire Chief]

---

Plaintiff did not adequately allege Fire Chief Majchrzak was a final policymaker vis-à-vis several employment decisions concerning the plaintiff in *Blake*. *Id.* But the *Blake* plaintiff never alleged that Frederick County *delegated* policymaking authority to Fire Chief Majchrzak. *Id.* ("[A]lthough policymaking authority can be delegated, Blake does not allege that the Board of Supervisors or Bollhoefer delegated this final policymaking authority to Majchrzak." (citation omitted)). Unlike in this case, *Blake* plaintiff's briefing also did not raise delegation at all. *See generally* Dkt. 30, *Blake v. Majchrzak*, No. 5:24-cv-00068, (W.D. Va. May 22, 2025). Thus, the court's determination in *Blake* does not control here.

- 19 -

acts in lieu of the governing body to set goals and to structure and design the area of [FCFR policy]." *Bennett v. City of Slidell*, 728 F.2d 762, 770 (5th Cir. 1984).

Defendants do not seem to contest Plaintiff's delegation argument. Instead, their sole argument that the Fire Chief is not final policymaker relies on the fact that the County Administrator may, in some circumstances, reverse the Fire Chief's decisions. (Defs.' Reply at 4–5 (Dkt. 9).) Frederick County ordinance creates a "Fire and Rescue Association"—a body tasked with "providing advice, counsel, and recommendations to the [Fire] Chief"— which may "object to a systemwide policy, rule, or regulation enacted by the [Fire] Chief." FREDERICK, VA., ORDINANCES §§ 89-4(A), 89-5(B). When the Fire Chief and the Fire and Rescue Association cannot resolve their dispute, then the contested issue may be raised "to the County Administrator for a final determination." *Id.* § 89-5(B). Thus, Defendants argue, because the County Administrator may have the last word over contested matters of FCFR policy, the Fire Chief is not the *final* policymaker. (Defs.' Reply at 4–5.)

Defendants' argument is unavailing. As the Fourth Circuit has held, "a municipal agency or official may have final authority to make and implement policy despite a municipality's retention of powers of ultimate control over both policy and policymaker." *Hunter*, 897 F.3d at 560–61 (quoting *Spell*, 824 F.2d at 1386). Contrary to Defendants' argument, an entity has final authority to set policy for a municipality "when no further action is needed for the policy to take effect." *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016); *see also Riddick v. Sch. Bd.*, 238 F.3d 518, 524 (4th Cir. 2000) (noting that an official is not a final policymaker if their policy "*has* to be approved" by a higher authority (emphasis

added)).  Otherwise, Frederick County would be able to "avoid attribution of policy to itself simply by officially retaining *unexercised ultimate authority* to countermand a policy or to discipline or discharge [a] policymaker."  *Hunter*, 897 F.3d at 561 (quoting *Spell*, 824 F.2d at 1386) (emphasis in original).

To be sure, the Fourth Circuit has stated that "[i]f an official's acts are subject to review or supervision by a municipal policymaker . . . that official does not have final policymaking authority."  *Misjuns v. City of Lynchburg*, 139 F.4th 378, 385 (4th Cir. 2025).  But there, the Fourth Circuit referred to *acts*, not *policy* decisions.  "[T]here is a marked difference between 'the authority to make final policy [and] the authority to make final implementing decisions.'"  *Hunter*, 897 F.3d at 555 (quoting *Greensboro Pro. Fire Fighters Ass'n, Loc. 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995)).  For example, the Supreme Court has explained that a "County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy."  *Pembaur*, 475 U.S. at 483 n.12. Unlike for their discretionary acts, a policymaker's formulation of *policy* may be hypothetically subject to reversal without necessarily stripping them of their "final policymaking authority" for purposes of *Monell*.  *Hunter*, 897 F.3d at 561; *Liverman*, 844 F.3d at 413; *Spell*, 824 F.2d at 1386.

Here, Plaintiff has adequately alleged that "no further action [was] needed for the [Fire Chief's] policy" regarding recruit training "to take effect" once he formulated it, *Liverman*, 844 F.3d at 413.  (*See* Compl. ¶¶ 23, 26, 28–32 (describing changes that occurred in the FCFR's training program after the then-Fire Chief formulated a plan to turn it into a "paramilitary"

school).)  That the County Administrator could hypothetically reverse the Fire Chief's policy does not necessarily mean that the Fire Chief lacked "authority-in-fact" to set FCFR's training policy.  *Hunter*, 897 F.3d at 561.

For these reasons, "Plaintiff has sufficiently alleged, at the pleading stage, that Defendant [Majchrzak] possessed final policymaking authority" to formulate FCFR's recruit training policy.  *Mullins v. Johnson*, No. 1:22-cv-00098, 2024 WL 1288227, at *12 (N.D.W. Va. Mar. 26, 2024).

> 2.  <u>Plaintiff has adequately alleged deliberate indifference through a failure to train.</u>

Next, the court addresses Plaintiff's first theory of municipal liability: that Frederick County failed to properly train employees in "deliberate indifference to the rights of persons with whom the [employees] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  To state a claim for a failure to train, a plaintiff must plead "(1) that the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) that the supervisor failed to train properly the subordinates[,] thus illustrating a deliberate indifference to the rights of the persons with whom the subordinates come into contact; and (3) that this failure to train actually caused the subordinates to violate the plaintiff's rights."  *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014) (cleaned up).  A plaintiff can allege the second element by showing "that policymakers were aware of, and acquiesced in, a pattern of constitutional violations."  *Id.* (citing *City of Canton*, 489 U.S. at 397 (O'Connor, J., concurring in part and dissenting in part)).

Plaintiff adequately pleaded failure to train liability for Frederick County. First, as discussed above, Plaintiff plausibly alleged that Ritter violated Strickler's constitutional rights. Second, Plaintiff alleges "that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Gallimore*, 38 F. Supp. 3d at 726 (cleaned up). The complaint includes allegations that Ritter intentionally caused over a dozen injuries, including two cardiac emergencies, (Compl. ¶¶ 51–58, 67); that Ritter methodically hazed recruits, (*id.* ¶¶ 29–33); that a female recruit sustained so many injuries that Ritter was warned to stop documenting injuries or lose his position, (*id.* ¶ 35); that Ritter threatened to "fuck [a recruit] up," (*id.* ¶ 55); and that a lieutenant warned Ritter that he was endangering recruits' lives, (*id.* ¶ 44). Plaintiff also alleges that Fire Chief Majchrzak witnessed and approved of Ritter's physical training methods, despite these injuries, (*id.* ¶ 39); that the Deputy Fire Chief, when told that recruits' lives were at risk, stated that he "stood by [his] marine," (*id.* ¶ 44); and that senior leadership encouraged Ritter to stop generating a paper trail of injuries, (*id.* ¶ 35). At the pleading stage, this sufficiently alleges "deliberate indifference" to the individuals that Ritter trained. *See Brown v. Mitchell*, 308 F. Supp. 2d 682, 703 (E.D. Va. 2004) (collecting cases showing that "if the supervisory power is actually aware of the fact that its subordinates are regularly violating constitutional or statutory rights, and the supervisory power fails to implement a training program to quell this pattern, deliberate indifference exists.").

Third, Plaintiff has adequately alleged a causal relationship between FCFR's failure to train and Strickler's death. *Palma v. Montgomery Cnty.*, 598 F. Supp. 3d 288, 298 (D. Md. 2022). Plaintiff's allegations plausibly show that Strickler's death would not have occurred if the Fire

- 23 -

Chief had removed Ritter or trained Ritter not to haze and injure recruits.  In other words, the alleged pattern of injuries and cardiac events under Ritter make it plausible that "occurrence of the specific violation [was a] reasonable probability rather than a mere possibility."  *Spell*, 824 F.2d at 1390–91.  Accordingly, Plaintiff plausibly alleges that Frederick County is liable under a failure to train theory.

    3.  <u>Plaintiff has adequately alleged a widespread custom of unconstitutional conduct.</u>

Next, Plaintiff argues that Ritter's conduct constitutes "a practice that is so persistent and widespread as to constitute a custom or usage with the force of law."  *Lytle*, 326 F.3d at 471 (cleaned up).  To succeed under this theory, a plaintiff must show (1) that the municipality had "actual or constructive knowledge of the custom and usage," and (2) that, either with "specific intent or deliberate indifference," its policymakers failed to "correct or terminate the improper custom and usage."  *Smith v. City of Greensboro*, No. 1:19-cv-00386, 2020 WL 1452114, at *12 (M.D.N.C. Mar. 25, 2020) (quoting *Randall v. Prince George's Cnty.*, 302 F.3d 188, 210 (4th Cir. 2002)) (cleaned up).

Defendants' sole argument against custom-or-practice liability is that the County Board of Supervisors, as final policymaker, did not have actual or constructive knowledge of any unconstitutional custom or policy.  (Defs.' Reply at 7.)  But as this court holds above, the Fire Chief was—at least plausibly—the final policymaker for FCFR's training protocols.  And, as discussed, Plaintiff adequately alleges that the Fire Chief witnessed and approved of Ritter's physical training method.  (Compl. ¶ 39; *see also id.* ¶¶ 35, 44.)  Plaintiff also alleges more than a few "isolated" incidents of allegedly unconstitutional conduct.  *Milligan v. City of Newport*

*News*, 743 F.2d 227, 230 (4th Cir. 1984). Plaintiff alleges that Ritter intentionally caused over a dozen injuries, (Compl. ¶¶ 51–58, 67); hazed recruits over a period of several years, (*id.* ¶¶ 29–32); and that a lieutenant warned the Fire Chief that Ritter's training endangered recruits' lives, (*id.* ¶ 44). These allegations far surpass the Fourth Circuit's low bar for plausible allegations of an unconstitutional custom. *Owens*, 767 F.3d at 403 (finding that mere references to "reported and unreported cases" and "successful motions" sufficiently stated a widespread practice of *Brady* violations by the state's attorney).

Second, Plaintiff adequately alleges that the Fire Chief "fail[ed] as a matter of specific intent or deliberate indifference[] thereafter to correct or stop the practices." *Spell*, 824 F.2d at 1391. Plaintiff alleges that even after the Fire Chief contracted OneLife Fitness as a result of "the massive number of injuries" that occurred under Ritter, (Compl. ¶ 46), the Fire Chief "retained [him] as Lead Instructor for select days of PT" which gave Ritter "total discretion to train the recruits as he saw fit" and engage in "the same abusive and demeaning hazing the recruits of prior years underwent," (Compl. ¶¶ 48, 50). This adequately alleges that the Fire Chief "fail[ed] to put a stop to or correct" the custom at issue. *Owens*, 767 F.3d at 402.

Accordingly, Plaintiff plausibly alleges that Frederick County is liable under the "widespread custom" theory of *Monell* liability.

4. <u>Plaintiff has adequately alleged that Frederick County's final policymaker ratified Ritter's conduct.</u>

Finally, Plaintiff argues that Frederick County itself—through Fire Chief Majchrzak—expressly endorsed Ritter's conduct. When a final policymaker "has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also

give rise to liability under Section 1983." *Starbuck*, 28 F.4th at 534 (citing *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994)). This is known as ratification liability, which "holds the municipality liable for its own decision to uphold the actions of subordinates." *Id.* (emphasis in original). In order to show that a decision has been ratified, a plaintiff must demonstrate that the final policymaker was both aware of the subordinate's action at issue and "*affirmatively approved* both the act and its rationale." *Davison v. Loudoun Cnty. Bd. of Supervisors*, No. 1:16-cv-00932, 2016 WL 4801617, at *6 (E.D. Va. Sept. 14, 2016) (emphasis added). Moreover, "the official policy itself must inflict the alleged injury." *Franklin v. City of Charlotte*, 64 F.4th 519, 536 (4th Cir. 2023) (quoting *Monell*, 436 U.S. at 694) (cleaned up).

Defendants' sole argument against ratification liability is—again—that the Fire Chief is not a final policymaker, (Defs.' Reply at 5 n.2), which the court has rejected. Even if Defendants had addressed the elements of ratification liability specifically, their arguments would have failed. As discussed, Plaintiff has plausibly alleged that the Fire Chief knew of and "affirmatively approved" Ritter's decision to haze and injure recruits. (Compl. ¶ 39 ("Chief Majchrzak would meet with the recruits and express his admiration and approval of Kyle Ritter's training methods.").) The complaint also plausibly alleges that the Fire Chief "affirmatively approved" the rationale for Ritter's training: the desire to keep FCFR as a "paramilitary" recruit school. (*Id.* ¶¶ 26, 48.) Accordingly, Plaintiff plausibly alleges ratification liability.

## IV.   Conclusion

"Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."  *Owens*, 767 F.3d at 403.  At the pleading stage, "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high."  *Id.*  "Of course, to prevail on the merits, [Plaintiff] will have to do more than *allege* . . . misconduct; [Plaintiff] must *prove* it."  *Id.* (emphases in original).  But Plaintiff has alleged facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This is sufficient to survive a Rule 12(b)(6) motion to dismiss.

For this reason, the court will **DENY** Defendants' motion to dismiss.  An appropriate Order will issue.

**ENTERED** this  30th day of July, 2026.

_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE